**FRASER v. UNITED STATES (two cases).**
**BARTON et al. v. SAME.**
**Nos. 9639–9641.**

Circuit Court of Appeals, Sixth Circuit.
Oct. 3, 1944.

Writ of Certiorari Denied Feb. 26, 1945.

See 65 S.Ct. 684.

W. C. Rodgers, of Memphis, Tenn., for William Fraser and Mrs. William Fraser.

Fred Callahan, of Memphis, Tenn. (Fred Callahan and Granville Farrar, both of Memphis, Tenn., on the brief), for P. M. Barton et al.

Mary Connor Myers, of Washington, D. C., (J. Stephen Doyle, Jr., of Washington, D.C., and William McClanahan and R. G. Draper, both of Memphis, Tenn., on the brief), for the United States.

Before HICKS, SIMONS, and Mc-ALLISTER, Circuit Judges.

SIMONS, Circuit Judge.

These appeals challenge the liability of purchasers of non-quota cotton for penalties prescribed by the Agricultural Adjustment Act of 1938, 7 U.S.C.A. § 1348, as amended by Joint Resolution P.L. No. 74, 77th Congress, 7 U.S.C.A. §§ 1330, 1340. The original controversy arose between the producers and the purchasers as to which party was required to pay the penalty, but the United States intervened, and on the ground that the purchasers had made no accounting to the producers for the avails of the cotton, that they had neither paid the producers nor the government tax and had not segregated any fund for the payment of the penalty, nor given notice of any kind to the United States of the sale and transfer of the cotton, as provided by law, sought payment of the penalty from both producers and purchasers. The court gave judgment for the government in the amount of the penalty against both, and impounded avails of the cotton discovered in possession of Mrs. Fraser through pretrial depositions of the Frasers under Rule 26, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, by interrogatories which are alleged by them to be an invasion of the privilege resulting from their marital relation.

■■ Barton and others were owners of the Three-Way Land Company which, in 1941, leased some 15,000 acres, planted to cotton, on a share-crop basis. Negotiations with Fraser and Britton resulted in an agreement in the nature of an option exercised by Fraser as he secured buyers for the cotton. It is Fraser's contention that the contract relieved him and his associate from obligation to pay the penalty because in a letter on which the contract was based, he said, "we are not interested in any government tax." This observation is relied upon to show that the tax was to be paid by Barton. It is not to such extent unequivocal as to close the door to extrinsic proofs of the terms of the agreement. There was evidence that Fraser proposed to sell the cotton at a price sufficient to enable him to pay Barton 15½ cents a pound, or an average of $7 a bale "above loan values," and that Barton understood this to mean that it would be net to him after payment of all government claims. This understanding was confirmed in later letters between the parties, and there was testimony of trade usage that "above loan value" comprehended payment by the purchaser of government penalties. In view of the fact that Fraser's interpretation of the agreement would have enabled him to make a profit of over $46,000, while Barton and the farmers received less than $20,000, the contracting parties could not reasonably have intended such result. In any event, the trial judge who heard the evidence, decided the issue against Fraser, and we are unable to say that his holding was clearly wrong.

■■ Barton's suit is challenged on the ground that he is not the proper party plaintiff, because in an earlier suit upon the same cause of action in Missouri, the complaint was filed on behalf of the Three-Way Land Company, a Corporation. It appears, however, that since the Missouri case was begun the corporation has surrendered its charter, and given Barton authority to liquidate and wind up its affairs. We think the suit was properly brought by Barton in view of the circumstances. No estoppel arises out of the fact that the earlier suit counted upon a contract evidenced by a letter of April 24, while the agreement here sued upon depends upon an April 2nd letter. The court found that reference to the April 24th letter in the Missouri suit, was the result of an error in the drafting of the complaint. While evidence to support this finding is meager, the April 24th letter was in existence, and the Missouri complaint was hurriedly drawn. There being no showing of wilful misstatement, and none of prejudice, there is no estoppel. Behr v. Connecticut Mutual Life Ins. Co., C.C., 4 F. 357, 362; Broyles v. Scottish Union & Nat. Ins. Co., 16 Tenn.App. 331, 336, 64 S. W.2d 517; Southern Coal & Iron Co. v. Schwoon, 145 Tenn. 191, 239 S.W. 398.

■ Aside from question of liability for penalties as between the parties to the contract, Fraser contends that he is not liable under the Act. He relies upon 7 U.S.C.A. § 1348, which provides, "any farmer who * * * markets cotton in excess of the * * * quota * * * shall be subject to the following penalties." 7 U.S.C.A. § 1372, however, provides that "the penalty * * * shall be collected by the buyer" and paid "as the Secretary may by regulations prescribe. Such penalties shall be remitted to the Secretary by the person liable for the penalty, except that if any other person is liable for the collection of the penalty, such other person shall remit the penalty." Section 1372 also provides that penalties shall be collected and paid in such manner, at such times, and under such conditions as the Secretary may, by regulations, prescribe, and in pursuance of such authority there were promulgated "Regulations Pertaining to Cotton Marketing Quotas for the 1941-1942 Marketing Year" identified as (Cotton 507) of which § 702 provides "the penalty in connection with the marketing of cotton by sale to any person within the United States shall be collected by the buyer at the time of sale. * * *" It is true that this regulation also recognizes an agreement between producer and buyer in reference to cotton, but this is limited to processed cotton. There must have been purpose and not inadvertence in the distinction. By § 703 of the Regulations, the penalty is to be remitted not later than 15 calendar days next succeeding the day on which the cotton was marketed by the producer.

The court held both parties liable, and we agree. Fraser withheld both from Barton and the United States, the amount of the penalty, and so in effect collected it. Tennessee cases holding that no one may be made a bailee without his consent, are unimportant, for we are concerned with a Federal statute implementing a policy of national control of agricultural marketing conditions, and insofar as it is a valid exercise of the commerce power, it is paramount to state law. No question of due process inheres in holding the buyer who collects the penalty liable for its payment. When, with notice, he buys non-quota cotton, he subjects himself to the provisions of the Act and may not complain. He is under no obligation to buy.

■ Fraser's contention that even if liable for penalties it is only to the extent of 3¢ per pound instead of 7¢ per pound, must be rejected. Originally the Act of 1938, as amended, 7 U.S.C.A. § 1348, 52 Stat. 59, provided for a penalty on non-quota cotton of 2¢ per pound if marketed during the first marketing year when quotas are in effect, and 3¢ per pound if marketed during any subsequent year. This provision was, however, amended by Joint Resolution No. 74, 77th Congress, captioned "Joint Resolution Relating to corn and wheat marketing quotas under the Agricultural Adjustment Act of 1938, as Amended." Subsection 9 of the Resolution raised the penalty on non-quota cotton for the 1941-1942 marketing year, to 7¢ per pound. No invalidity is perceived in this section by reason of the omission from the caption of any reference to cotton. While many state constitutions require the purpose of a statute to be fully expressed in its title, and while this requirement has been construed with varying degrees of liberality by state courts, no such requirement attaches to Congressional enactments. There would seem to be no more reason for eliminating cotton from subsection 9 by invoking the doctrine "expressio unius," than for inserting it in the caption if the doctrine ever could be invoked in a situation of this kind.

■ Fraser's complaint at being enjoined from transferring assets and being required to pay money disclosed in his wife's possession, into the registry of the court pending trial and final determination, is likewise without merit except insofar as the latter may involve the question of privilege to be hereinafter discussed. It has been held, Behre v. Anchor Ins. Co., 2 Cir., 297 F. 986, that an averment that a defendant intends to transfer funds out of the jurisdiction, is insufficient to support an injunction if the defendant is solvent. Here it was alleged that Fraser was insolvent, and he admitted inability to pay the full amount of the penalty. In H. P. Hood & Sons v. United States, 1 Cir., 97 F.2d 677, the defendant who was contesting the validity of the Marketing Agreement Act, was required to pay the sums alleged to be due under the Act, into court, pending determination of the controversy. United States v. Adler's Creamery, 2 Cir., 107 F.2d 987, is not in conflict for decision was rested upon absence of a showing that there was likelihood of irreparable injury pendente lite. In Mulford v. Smith, 307 U.S. 38, 45, 59 S.Ct. 648, 83 L.Ed. 1092, involving comparable provisions of the Act, it

was noted, without criticism, that the District Court had directed payments required to be made under the law, to be paid into its registry pending determination. The proceedings below were in equity, and it would have been competent for the court to have appointed a receiver or custodian for the disputed fund to prevent its dissipation. Payment into the registry of the court adequately served a like purpose. The judgment against appellants for the penalty and for Barton on the contract must be sustained and, as will presently appear, it gained nothing from the disclosures allegedly invading the sanctity of the marital relation.

The Frasers, however, seek relief beyond that involved in determining the soundness of the judgment. Its validity notwithstanding, they urge a return of the money paid into the registry of the court, and this involves consideration of a problem of some difficulty. Fraser, when examined on his pre-trial deposition, was asked what he had done with the proceeds of the Barton cotton. He undertook an explanation which accounted for a small portion of the proceeds, and when asked about the remainder, said he knew where $30,000 of it was. When pressed considering its location, he refused to answer on advice of counsel. It had been disclosed that Fraser and Mrs. Fraser both had lock-boxes in local banks, and counsel for Fraser objected on the ground that if Fraser answered the query it would violate privileged communications between himself and wife since one of the boxes was in her name. Upon the court directing Fraser to answer, he stated that Mrs. Fraser had possession and control of $27,000 in cash, a check for $2,711, and a $2,500 war bond, though he didn't know where the money was, but that he would be glad to telephone Mrs. Fraser to come down; that he had given the money to his wife because Barton was trying to have an arbitration before the Cotton Exchange; that none of the proceeds of the cotton was in the lock-box.

A subpoena was then issued under Rule 26, for Mrs. Fraser, and after she had been afforded time to confer with her husband and his counsel, she was asked if she had money resulting from the sale of the Barton cotton, and replied that she had $27,000 in currency on her person and was willing to turn the money over to the clerk of court to await final decision as to who might be entitled to it "if it is the right thing to do." She further testified that her husband turned the money over to her at home to take care of. The court directed her to turn the funds over to the clerk of court, and she, without objection, complied. It is conceded that the funds delivered by Mrs. Fraser to the clerk, were proceeds of the Barton cotton, although upon later examination Mrs. Fraser testified that her husband had not told her where he got the money, that she was not concealing it, even though she had not deposited the funds nor put them into her safety deposit box—this without objection from Fraser.

The public policy which lies at the foundation of every rule of privileged communications, is satisfied in the privilege accorded by the law to communications between husband and wife. They originate in confidence which is essential to the relation, and the relation is a proper object of encouragement by law, for the injury that would inure to it by disclosure is greater than the benefit that would result in a judicial investigation of the truth. Wigmore on Evidence, 3rd Edition, § 2332. The confidence that attaches to communications between husband and wife has for its purpose free and unrestrained privacy divested of any apprehension of compulsory disclosure. Wigmore, § 2336. All marital communications are, by implication, confidential, and a contrary intention must be made to appear by the circumstances of any given instance. Such is the general judicial attitude. While the protection generally extends only to communications, i. e., utterances and not acts, nevertheless the statute in some jurisdictions extends the privilege to transactions, or to knowledge of any fact acquired in the marital relation. Wigmore, § 2337. The Tennessee Statute undoubtedly is within this classification, though it uses the phrasing, "any matter that occurred between them by virtue of or in consequence of the marital relations." Tennessee Code, § 9777. Tennessee decisions have generally been jealous in protecting the privilege not only with respect to words, but also to acts. Phoenix Fire & Marine Ins. Co. v. Shoemaker, 95 Tenn. 72, 31 S.W. 270. See also Young v. Hurst, Tenn.Ch.App., 48 S.W. 355; Washington and Smith, Executors, v. Bedford, 78 Tenn. 243, 10 Lea 243.

It has, however, been held in some jurisdictions, that where the husband is acting in furtherance of a fraud, a court

of equity in the absence of other evidence, in order to unearth the fraud and expose it in all its details, will permit both husband and wife to testify to the conversations had between them with regard to the transaction. Moeckle v. Heim, 134 Mo. 576, 36 S.W. 226; Henry v. Sneed, 99 Mo. 407, 12 S.W. 663, 17 Am.St.Rep. 580. It has also been held that a communication by a husband to his wife, of the existence of a right of third persons of which he is attempting to defraud them by a conveyance to her, cannot be regarded as privileged. Tobias v. Adams, 201 Cal. 689, 258 P. 588; Eddy v. Bosley, 34 Tex.Civ.App. 116, 78 S. W. 565. It must be conceded that no Tennessee decision announces such exceptions to the application of the privilege. Neither is there any decision which rejects such exceptions, although in Phœnix Fire & Marine Ins. Co. v. Shoemaker, supra, neither husband nor wife was a competent witness to the delivery of a deed between them, and in Young v. Hurst, supra, both were incompetent witnesses to a gift from husband to wife. In each case, however, the wife, while unable to testify to receipt from the husband, was permitted to avow her possession of the article in question. It would seem to us, therefore, upon a careful consideration of the problem that the public policy which regards and protects as confidential the private communications, or the acts which are their equivalent, between husband and wife, does not, under the law of Tennessee, necessarily extend to those communications and acts which are in furtherance of a fraud, particularly when the purpose of the fraud includes depriving the government of opportunity to collect lawfully imposed revenue or statutory penalties.

So much for the law of Tennessee. The case, however, arises in a federal court of equity jurisdiction, and the problem presently discussed involves remedial rights as distinguished from substantive rights, and equitable powers which, having their source in the Constitution, were conferred upon the courts of the United States by § 11 of the Judiciary Act, 1 Stat. 78, 28 U.S.C.A. § 41. So we have recently been reminded in York v. Guaranty Trust Co. of New York, 2 Cir., 143 F. 2d 503, 523, that the Supreme Court in Kirby v. Lake Shore & M. S. R. Co., 120 U.S. 130, 7 S.Ct. 430, 30 L.Ed. 569, declared, "the equity jurisdiction of the courts of the United States cannot be impaired by the

laws of the respective states in which they sit." This judgment, in both of the cited cases, involved state statutes of limitation. If, however, the rationalization in the York case, supra, supported as it is by copious annotation, is sound, and the rule of the Kirby case prevails, notwithstanding Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, we must conclude that a federal equity court is not necessarily bound to apply a state statute giving added breadth to an evidentiary rule of privilege, when clearly it is inequitable to do so.

Moreover, the privilege that attaches to confidential communications between husband and wife may be waived, and the waiver belongs to the communicating spouse, the addressee of the communication not being entitled to object. Wigmore, § 2340. It will be observed that Mrs. Fraser answered readily without objection, and disclosed not only possession of the money and securities, but their source. Fraser, on the other hand, claimed the privilege, but when directed to answer, complied without further protest. Had he persisted in his refusal to answer, it would, of course, have been at the hazard of being cited and punished for contempt, but in the event of punishment he would not have been without remedy and might have challenged the action of the court by petition for writ of habeas corpus, or by an appeal from the contempt order. He declined the hazard. May it thus not be said that though first invoking the privilege he ended by waiving it? We think this is a logical conclusion. If it be urged that the vindication of the privilege does not require one to subject himself to punishment for contumacy, nevertheless a similar surrender results when a defendant, subject to a civil or criminal judgment which he believes to be erroneous, fails to appeal.

It is urged upon us that there is analogy between denial of a privilege and invasion of constitutional right, and we are cited to cases arising under national and state prohibition statutes wherein, upon an adjudication that prohibited liquors were seized without a search warrant, the remedy has been not only to exclude them from evidence but to order their return. The sounder rule, however, is that constitutional immunity from unreasonable search and seizure is completely vindicated by excluding the seizures from evidence at the trial without requiring that they be returned.

Voorhies v. United States, 5 Cir., 299 F. 275; Haywood v. United States, 7 Cir., 268 F. 795; United States v. O'Dowd, D.C., 273 F. 600 (opinion by the late Judge Westenhaver); United States v. Eight Boxes, 2 Cir., 105 F.2d 896, 897. This does not, of course, apply to documents having only evidential value as in Weeks v. United States, 232 U.S. 383, 384, 34 S.Ct. 341, 58 L.Ed. 652, L.R.A.1915B, 834, Ann.Cas. 1915C, 1177.

 If, however, we are wrong in our rationalization of the effect of Fraser's compliance as a waiver, another consideration compels us to reach the same result. The controversy below was submitted to a court of equity, and equitable remedies, by way of accounting and injunction, were sought by both plaintiff and intervenor. Assuming the order of the court compelling disclosure to have been erroneous as an invasion of privacy in communications between husband and wife, the disclosure, once made, is irrevocable. It is public property and may not be recalled. So disclosed, it reveals that Fraser retained and concealed from both Barton and the United States, the avails of the cotton, for one does not usually convert $30,000 into cash to keep such sum upon his person, or permit his wife to keep it on her person, for a lawful and legitimate purpose. The court found upon evidence that we deem substantial, that if the Frasers had not been required to disclose the whereabouts of a part of the funds, and if Mrs. Fraser had not been required to pay it into court to be there held subject to the rights and claims of the parties to the suit, Fraser would have continued to conceal and appropriate the money, and irreparable loss and damage would thus have resulted both to the plaintiffs and the intervenor.

In this posture of the case, a court of equity was asked to return the money to Fraser without any undertaking by him that it would be paid to Barton or the government if either or both were adjudged entitled to receive it at the conclusion of the trial. It is futile to urge that the government should have been relegated to procedure by execution or attachment in the enforcement of a judgment. If the infirmities of the disclosure now require the return of the money to Fraser, by the same token neither plaintiff nor intervenor could have taken advantage of an erroneously compelled disclosure in collecting the judgment. In short, the Frasers now demand

that they be again put in possession of funds they sought to retain and conceal. The inference is inescapable, that they will again conceal them to defeat the judgment. A court of equity will lend no aid to such enterprise.

 Only one other contention of Fraser merits consideration. He complains that he was compelled to testify when his physical condition was such that he was not strong enough to stand the strain of examination without endangering his health, and that Mrs. Fraser was deprived of her right as a female witness to have her deposition taken at home under the provisions of § 9807 of the Tennessee Code. Mrs. Fraser raised no objection to her leaving home for the purpose of testifying, and the record discloses no untoward effect on Fraser as the result of the hearing. Finally, it is not contended on behalf of either, that testimony as to the disposition of the $30,000 was either inaccurate or confused.

The judgment is affirmed.