### EUGENE MICHAEL COLEMAN *v.* STATE OF MARYLAND

[No. 325, September Term, 1976.]

*Decided March 10, 1977.*

---

**11.** *See* Burgett v. Texas, 389 U. S. 109, 115, 88 S. Ct. 258, 262 (1967); Howard v. State, 19 Md. App. 673, 676-77, 313 A. 2d 567, 569 (1974).

The cause was argued before MOORE, LOWE and MELVIN, JJ.

*Luther C. West, Assigned Public Defender*, for appellant.

*Bernard A. Raum, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General, Henry E. Dugan, Jr., Assistant Attorney General, William A Swisher, State's Attorney for Baltimore City*, and *Wayne Cymek, Assistant State's Attorney for Baltimore City*, on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

Convicted of rape, perverted practice and larceny, at a jury trial in the Criminal Court of Baltimore (Arabian, J., presiding), appellant, Eugene Michael Coleman, was sentenced to twenty years imprisonment for rape and ten years and eighteen months, respectively, (to be served concurrently with the rape sentence) for the perverted practice and larceny convictions. On appeal, he takes issue with certain of the trial court's rulings on the admissibility of testimony. Finding no error, we affirm.

I

Rose Weaver, the prosecutrix, met the appellant in a local Baltimore bar at approximately 10:30 on the evening of September 24, 1975. Agreeing to accompany the appellant for a pizza, the two ended up in Coleman's apartment. They remained there only a short time before walking down the hall to the apartment of a neighbor, Gloria McCue, because appellant wanted to introduce them. The three then returned to appellant's apartment.

According to Mrs. Weaver's testimony, her casual visit turned quickly into a nightmare. She became trapped inside appellant's apartment by a lock to which only the appellant had the key and appellant began to rip her clothes off, pour beer over her and assault her with his hands, shoes and a coffee table. Despite her cries, protests and physical retaliation against him, the appellant continued to abuse her physically until she finally submitted to sexual intercourse and to performing fellatio. Also, the victim stated at trial, the appellant at one point emptied the contents of her purse, which she testified held approximately $12 in change and a diamond engagement ring, and stated, "Boy, I'm really going to clean up tonight. Look at all the money I got."

After her forced submission, the appellant permitted her to leave and apparently gave her cab fare. Ms. McCue gave her a dress to wear. Mrs. Weaver admitted originally lying to the police when she first reported the incident. She told them that appellant had kidnapped her off the street. At trial, she explained this by declaring she was too embarrassed to admit that she voluntarily accompanied the appellant to his apartment.

Gloria McCue was present in appellant's apartment and substantially confirmed the events of the evening, at trial. She testified that she tried to comfort the prosecutrix and offered herself to appellant, but the latter declined, stating that he could have her anytime and that, "He wanted something different."

The State's medical expert and the investigating police officer both testified at trial that they observed bruises and

abrasions on the victim's body consistent with a physical assault.

Appellant's sole, witness, Clifton Harris, whom the appellant had met while in jail several weeks prior to trial, testified that he knew Rose Weaver for several years and that she had a bad reputation in the community for chastity.

## II

On direct examination, the State's Attorney elicited, over objection, the following testimony from appellant's wife concerning a conversation with him when he telephoned her at work from jail, one or two days after the alleged crimes:

"Q Okay, and what was the conversation that you had with your husband at that time?

MR. DWIN: Objection.

THE COURT: Overruled.

THE WITNESS: Answer?

Q (BY MR. CYMEK): Yes, you can.

A He had asked me — I was at work and he had asked me to go up to his apartment and to get the ring that he took from the girl because he was afraid Gloria was going to turn it over to the police because she gave them a statement."

Appellant contends that this telephone conversation constituted a confidential communication between husband and wife and was therefore improperly received at trial in contravention of Cts. & Jud. Proc. § 9-105 (Md. Code, 1974). Section 9-105 provides:

*"Testimony by spouses — Confidential communications occurring during marriage.*

One spouse is not competent to disclose any confidential communication between the spouses occurring during their marriage." [1]

---

1. As the Revisor's Note discloses, this section is new language derived from a portion of Art. 35, §§ 1 and 4. "The present statute uses the word 'competent' and is silent as to waiver by either spouse in a civil proceeding."

The statutory provision preventing one spouse from disclosing a confidential communication made by the other spouse, is to be distinguished from the right of a spouse not to be *compelled* to testify as an adverse witness in a criminal proceeding in which the other spouse is the accused (unless the charge involves the abuse of a child under 18). Cts. & Jud. Proc. § 9-106. At trial, Mrs. Coleman expressly declared her willingness to testify against her husband. For the reasons stated below, we hold that § 9-105 did not bar Mrs. Coleman's testimony with reference to appellant's telephone call.

The privilege of an accused to prevent his or her spouse from testifying as an adverse witness as to a confidential communication made during marriage is designed to promote and encourage the unrestrained flow of private communications between spouses, free from any fear of disclosure, in order to preserve and protect the integrity of the marital relationship. McCormick, *Handbook of the Law of Evidence* § 86 (2d ed., 1972); *Wolfle v. United States*, 291 U. S. 7, 14 (1934). The public policy evidenced by the privilege outweighs the disadvantages to the administration of justice such a privilege entails. 8 J. Wigmore, *Evidence* § 2332 (McNaughton, rev. 1961).

However, the privilege is not absolute. It applies only to those communications which are in fact confidential and which are induced by the marital relationship. 3 S. Gard, *Jones on Evidence* § 21:5 (6th ed. 1972); McCormick, *supra*, § 80; *Wolfle v. United States, supra*, 291 U. S. at 14. Thus, the privilege does not apply where a communication is made in the presence of a third person, *Metz v. State*, 9 Md. App. 15, 262 A. 2d 331 (1970); or where a communication intended for one spouse by the other is transmitted through a third person, *Gutridge v. State*, 236 Md. 514, 204 A. 2d 557 (1964); or where a communication, because of its nature or the circumstances under which it was made, is obviously not intended to be confidential, *see, e.g., Wolfle v. United States, supra*, 291 U. S. at 14; *People v. Burton*, 286 N.E.2d 792 (Ill. 1972); *People v. Dudley*, 301 N.Y.S.2d 9 (1969).

In the instant appeal, the threshold question is whether or

not the communication was confidential. The issue must, of course, be resolved in the context of the facts and circumstances disclosed by the record. These include:

1) The alleged victim, Rose Weaver, had taken the stand, prior to the wife, and had described the contents of her purse which appellant had thrown on the floor of the living room and had taken. The description of the property included a diamond engagement ring.

2) Appellant's neighbor, Gloria McCue, to whom appellant referred in his call to the wife from jail, had also testified that the "stuff" in Rose's pocketbook was "all over the floor" as a result of appellant's having emptied its contents, and that at appellant's bidding she took the ring and put it in a cabinet.

3) The alleged victim had given a statement to a police officer who testified later in the trial. This statement was taken within a few hours of the alleged crime and included a detailed description of the engagement ring which appellant had taken from her.

4) The wife further testified that she went to McCue's apartment and obtained the ring; and that subsequently a police officer came to her home and she gave it to him.

It is patent therefore that the husband's communication here did not involve the disclosure of a fact or facts not already known to others. The taking of the ring by the appellant was known to Gloria McCue, to the victim and, it appears, to the police before appellant ever communicated by telephone with his wife. Furthermore, because appellant and his wife were not living together, the husband knew that the wife's only means of access to his apartment to retrieve the ring was through a third party, Gloria McCue, who had hidden the ring at appellant's bidding. Under these circumstances, we think it is beyond doubt that the wife was competent to disclose, as she did, the telephone conversation

with the appellant. There was no confidentiality in appellant's telephone call. Where the communicating spouse has knowledge that his or her communication will be disclosed to third persons, the communication is no longer privileged. *See Wolfle v. United States, supra; Grulkey v. United States*, 394 F. 2d 244 (8th Cir. 1968); *Metz v. State, supra.*

In addition, we are constrained to question whether, at all events, the privilege from disclosure should obtain in circumstances where, as here, (a) the marriage, as a practical matter, had ended and (b) the invocation of the privilege would protect communications relating to acts of a criminal nature to be performed in furtherance of a crime.[2]

As for the "marriage," the testimony of the wife disclosed that she and appellant had lived together without benefit of matrimony for about seven years, that a child, five years of age at the time of trial, had been born of their relationship, that they entered into a marriage ceremony a few months before appellant's arrest for the sole reason that he was about to enter the Army and could obtain an allotment for the child as a dependent. They never lived together after the ceremony and, at the time of trial, the wife had commenced divorce proceedings. In these circumstances, the statutory policy would scarcely be subserved by the suppression of a confidential communication, even if such were involved. *See* 8 J. Wigmore, *Evidence, supra*, at § 2335; *McEntire v. McEntire*, 140 N. E. 328 (Ohio 1923); *McNamara v. McNamara*, 154 N. W. 858 (Neb. 1915). *Contra, People v. Fields*, 328 N.Y.S.2d 542 (App. Div. 1972).

With respect to the nature of the communication, it is at once apparent that appellant was seeking the concealment — through the agency of his wife — of the fruits of crime, *i.e.*, the diamond ring. While the Court of Appeals of Maryland and this Court have not had occasion to rule on the applicability of the privilege under such circumstances

---

2. As noted *infra*, McCormick points out that the "cognate" attorney-client privilege does not extend to communications between attorney and client where the client's purpose is "the furtherance of a future intended crime or fraud." McCormick, *supra*, at 395.

(see *Gutridge v. State, supra,* where former Chief Judge Henderson expressly left open the issue of "an exception to the privilege" in this type of situation, 236 Md. at 517, 204 A. 2d at 559), there is persuasive authority against its application.

In support of an exception to the privilege insulating marital confidences from disclosure where the communication is made in furtherance of a crime, Dean McCormick writes:

> "*The acts thus protected are frequently acts done in furtherance of a crime or fraud, and thus under the principle developed for the cognate privilege for attorney-client communications, should not be protected from disclosure even by direct communication. . . .* The attitude of the courts in these cases seems in effect a reaching back toward the old common law principle of preserving family harmony by disqualifying a spouse from testifying for or against the other. A different attitude it is believed would be wiser, namely, that of accepting the view that all privileges, in general, and this privilege for marital confidences in particular, are inept and clumsy devices to promote the policies they profess to serve, but are extremely effective as stumbling blocks to obstruct the attainment of justice. *Accordingly the movement should be toward restriction, and not toward expansion, of these mechanisms for concealment of relevant facts.*" (Emphasis added and footnote omitted.) McCormick, *supra,* at 164-165.

It is the recognition of society's significant interest in *preventing* criminal activity which justifies the exception. As stated by the Illinois Appellate Court in *People v. Simpson,* 350 N.E.2d 517, 524 (1976), "A loyal spouse should not, in our view, become a partner in crime with the blessing of the law bestowed through a . . . construction of the statute which is said to be supported by a policy of promoting marital bliss."

*See* West's Calif. Ann. Evid. Code, Art. 5, § 981 (1966);[3] *Fraser v. United States,* 145 F. 2d 139, 143 (6th Cir. 1944); *People v. Santos,* 102 Cal. Rptr. 678, 681 (Ct. of App. 1972).

In the present case, it is clear that appellant's message to his wife to "get the ring" in order to prevent Ms. McCue from turning it over to the police was a communication made in furtherance of a crime and which, if heeded, would have itself constituted criminal conduct subjecting the wife to prosecution as an accessory after the fact. *See McClain v. State,* 10 Md. App. 106, 268 A. 2d 572 (1970); *Watson v. State,* 208 Md. 210, 117 A. 2d 549 (1955). Therefore, even if the communication had been "confidential," Ms. Coleman's testimony would, in our judgment, have been properly received.

## III

On direct examination, the State's Attorney was permitted, over objection, to elicit the following testimony from appellant's wife:

"Q (BY MR. CYMEK): What did you — What happened when you went to 2225 Fayette Street?

A I went upstairs and I knocked on Gloria's door. She was sleeping on the sofa. She woke up, half awake. She let me in, and I asked her — I said, 'What happened with Mike,' and she started telling me all about, you know, the trouble they had up there.

Q What at that time did she tell you?

A She said that Mike was out drinking and he came in with some girl and he had a hold of her arm and he knocked on her door and said to her, 'I want you to come over and fix me something to eat.' So

---

**3.** "§ 981. EXCEPTION: CRIME or fraud.

There is no privilege [for confidential marital communications] under this article if the communication was made, in whole or in part, to enable or aid anyone to commit or plan to commit a crime or a fraud."

she went over and she was fixing — I don't know. I think she said a hamburger. I'm not sure about that, and she said next thing she knew they started arguing. Mike started going after this girl and he had poured beer on her head and started just fighting with her, falling all over the house, and he hit her several times, I understand.

Q Okay, and did she tell you anything else at that time?

A Yeah, she told me that he had forced this girl to have sex with him and I said, 'What were you doing there, Gloria, standing there watching? Why didn't you give some help to her? ' She said, 'I didn't want to leave. I was afraid he was going to kill her.'

MR. DWIN: Objection. Move it be stricken, Your Honor.

MR. CYMEK: Your Honor?

MR. DWIN: Wait a minute. Let her rule.

THE COURT: Overruled.

Q (BY MR. CYMEK): Continue.

A So I told her — I says, 'Why didn't you go get her some help? ' She said he had the door padlocked from the inside. I said he would have let her out. She said she was afraid he'd kill the girl if she left, and she was afraid for the girl's life, and she had asked somebody to stay with her. She was afraid. Then she told me the whole time he beat this girl he kept calling her Pat, and he said, 'Your blond hair is your downfall', and then he says to Gloria — He says, 'Do you remember what I told you about that girl I had up here and I tied to the bed and I beat her with a belt? You remember me saying that' ?

MR. DWIN: Your Honor, I move it be stricken and ask the jury be admonished about this.

THE COURT: Sustained. That will be stricken, those last — ."

Appellant contends that this testimony was hearsay and if it constituted impeachment of the court's witness, Gloria McCue, by prior inconsistent statement, an improper foundation was laid.

Mrs. Coleman's recounting of her conversation with Gloria McCue at trial was clearly hearsay. *See Johnson v. State*, 23 Md. App. 131, 136, 326 A. 2d 38, 41-42 (1974), *aff'd*, 275 Md. 291, 339 A. 2d 289 (1975). However, the court below permitted this testimony as impeachment of Ms. McCue's previous testimony by prior inconsistent statement.[4] On cross-examination, Ms. McCue was interrogated as follows:

"Q Isn't it a fact that during the time that you were in that apartment you pleaded with him to let her go?

A Yeah, I had talked to him.

Q That you feared for her life?

A I didn't say that.

\* \* \*

Q Okay. Isn't it a fact you stayed in that apartment so you could protect Mrs. Weaver?

A When she was on the couch, she was asking me not to go because Mike had said I could leave if I wanted to, and she asked me not to. So I stayed."

The rule is clear in Maryland that when a party seeks to impeach a witness by use of prior inconsistent statements, the party must first lay a proper foundation by affording the witness an opportunity to admit, deny or explain the alleged inconsistent statement. *White v. State*, 23 Md. App. 151, 326 A. 2d 219 (1974); *Devan v. State*, 17 Md. App. 182, 300 A. 2d

---

4. Although not raised in appellant's brief, we note that the trial judge failed to instruct the jury as to the limited use of the testimony admitted for impeachment purposes. Generally, the use of prior inconsistent statements is restricted to impeachment, and may not be received for any substantive or independent testimonial value. Patterson v. State, 275 Md. 563, 572-73, 342 A. 2d 660, 665 (1975). Appellant's failure to object or to request such instruction precludes our consideration of any such error. Md. Rule 1085; *see* Wilson v. State, 20 Md. App. 318, 327, 315 A. 2d 788, 793 (1974).

705 (1973); *Sellman v. State,* 232 Md. 344, 192 A. 2d 788 (1963). Generally, a proper foundation requires informing the witness as to the content of the statement and the time, place, and circumstances under which said statement was made. *White v. State, supra,* 23 Md. App. at 162, 326 A. 2d at 225; *Britton v. State,* 10 Md. App. 70, 267 A. 2d 747 (1970).

Following the State's cross-examination of Ms. McCue on the issue of whether she remained in the appellant's apartment, after he had given his permission for her to leave, out of fear for Mrs. Weaver's life, the State inquired of the witness, "Did you ever have conversations with Pat, Mike's wife?" The court sustained an objection to this question. In response to the State's proffer, at the bench, as to the relevance of this line of questioning for purposes of impeachment by prior inconsistent statement, the trial judge stated, "Well, I have ruled on this question. I see no relevance whatsoever unless you get into did she [Ms. McCue] ever make a statement to so and so that would be contradictory." The State contends on appeal that the trial judge's ruling precluded the State from laying the proper foundation on which the subsequent testimony of Mrs. Coleman, above quoted, would constitute prior inconsistent statements.

From our review of the record, we are unable to determine whether the State was in fact precluded by the defense from laying the proper foundation. However, assuming that the State failed to do so, we find that any error in permitting the testimony of appellant's wife as to her conversation with Ms. McCue was harmless beyond a reasonable doubt. *Dorsey v. State,* 276 Md. 638, 350 A. 2d 665 (1976). Mrs. Coleman's testimony as to what Ms. McCue told her about the appellant's conduct on the evening in question was merely cumulative of what Ms. McCue herself testified to on cross-examination.[5] The only significant deviation was the question of what motivated Ms. McCue to remain in the appellant's apartment during the attack on Mrs. Weaver, *i.e.,* whether she remained out of fear for Mrs. Weaver's life

---

5. Both sides were permitted to cross-examine Ms. McCue who was called, at their request, as a witness of the court.

or whether she stayed because Mrs. Weaver asked her to. Whether or not Ms. McCue feared for the victim's life is irrelevant to the rape, perverted practice and larceny charges of which appellant was convicted. Clearly, this testimony was not prejudicial since it was neither material nor relevant. *See Johnson v. State, supra.*

## IV

Appellant lumps together his previous two contentions and asserts that these errors constituted a denial of due process.

Appellant also contends that he was denied his right to a fair trial by the trial court's ruling precluding the appellant from questioning Mrs. Weaver as to what she thought was going to happen when she voluntarily accompanied the appellant to his apartment. The scope of cross-examination generally rests in the sound discretion of the trial court. *William v. State,* 15 Md. App. 320, 290 A. 2d 542 (1972); *Jenkins v. State,* 14 Md. App. 1, 285 A. 2d 667 (1971). We find no abuse of discretion and we note, at all events, that Mrs. Weaver substantially responded to this question in her answers to several other of appellant's questions.

Appellant further asserts a denial of a fair trial resulted from the lower court's ruling precluding the appellant from asking Ms. McCue whether she observed Mrs. Weaver attempt to leave the bedroom while the appellant forced her to submit to sexual relations. We perceive no error in the court's ruling. The testimony of the victim and Ms. McCue clearly demonstrated that Mrs. Weaver was forced to submit by physical abuse.

Finally, appellant contends that an extended hearing out of the presence of the jury, on the issue of the competency of appellant's sole witness, Clifton Harris, to testify as to Mrs. Weaver's reputation in her community, was improper. This contention is palpably without merit since Mr. Harris was subsequently permitted to testify before the jury concerning the victim's reputation.

Appellant's reliance on *Chambers v. Mississippi,* 410 U. S.

284 (1973) in asserting the above claims of error, is plainly misplaced.

*Judgments affirmed; costs to be paid by the appellant.*