## EUGENE MICHAEL COLEMAN *v.* STATE OF MARYLAND

[No. 53, September Term, 1977.]

*Decided December 8, 1977.*

*Motion for reconsideration filed December 20, 1977; denied January 3, 1978.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Bradford C. Peabody, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*F. Ford Loker, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

Appellant Coleman was found guilty by a jury in the Criminal Court of Baltimore of rape, perverted sexual practice, and larceny. He contended on appeal that his convictions should be reversed because a privileged

confidential communication between him and his wife was improperly admitted in evidence at his trial in violation of Maryland Code (1974), § 9-105 of the Courts and Judicial Proceedings Article; that section provides that "One spouse is not competent to disclose any confidential communication between the spouses occurring during their marriage." The Court of Special Appeals found no merit in the contention and affirmed the convictions. *Coleman v. State,* 35 Md. App. 208, 370 A. 2d 174 (1977). We granted certiorari to consider whether the admission in evidence of the challenged communication violated the provisions of the statute.

The evidence at trial disclosed that Rose Weaver accompanied Coleman to his apartment on the evening of September 24, 1975, where he raped her, emptied her pocketbook of $17 and a diamond ring, and forced her to submit to various perverted sexual acts.

Gloria McCue lived in the same apartment building as Coleman. She testified that she was present in Coleman's apartment during commission of the crimes and she corroborated the victim's version of the offenses. She admitted taking the ring which Coleman had stolen and placing it in a cabinet in his apartment at his request.

Coleman's wife voluntarily appeared as a witness against him.[1] Over Coleman's objection, she testified that he telephoned her from the jail after his arrest and asked her to go to his apartment and "get the ring that he took from the girl because he was afraid Gloria [McCue] was going to turn it over to the police because she gave them a statement."

As a result of this conversation, Mrs. Coleman went to see Gloria McCue, who gave her the ring. Mrs. Coleman thereafter gave the ring to the police.

The evidence showed that Mrs. Coleman had married the appellant several months prior to his arrest, although prior to the marriage they had lived together "off and on" for approximately seven years and had a five-year-old child. Mrs.

---

1. Maryland Code (1974), § 9-106 of the Courts Article provides that the spouse of a person on trial for crime "may not be compelled to testify as an adverse witness unless the charge involves the abuse of a child under 18." Mrs. Coleman did not invoke this privilege.

Coleman testified that the marriage was "completely a business arrangement" designed to permit her to obtain support payments for their child after Coleman's contemplated enlistment in the army. The Colemans did not live together after the marriage and at the time of the trial Mrs. Coleman had instituted divorce proceedings.

In affirming Coleman's convictions, the Court of Special Appeals concluded that the incriminating marital communication was not intended to be confidential, and hence the statute was inapplicable. It also held that because the marriage had for all practical purposes ended at the time the communication was made, the statute did not apply. Further, it held that since the communication was made in furtherance of a crime, the statutory privilege had no application.

The policy reasons underlying the privilege for confidential communications between husband and wife are (1) that the communications originate in confidence, (2) the confidence is essential to the relation, (3) the relation is a proper object of encouragement by the law, and (4) the injury that would inure to it by the disclosure is probably greater than the benefit that would result in the judicial investigation of truth. 8 Wigmore, *Evidence,* § 2332 (McNaughton rev. 1961). The essence of the privilege is to protect confidences only, *id.* at § 2336, and thereby encourage such communications free from fear of compulsory disclosure, thus promoting marital harmony. McCormick, *Handbook of the Law of Evidence* § 86 (2d ed. 1972).

While there is some disagreement among the authorities, the privilege appears to be of common law origin. McCormick refers to the privilege as one "born of the 'common law' " and suggests that statutes securing the privilege are "declaratory of the common law." McCormick, *supra,* §§ 78, 80. *See also Wolfle v. United States,* 291 U. S. 7, 54 S.. Ct. 279, 78 L. Ed. 617 (1934); 81 Am. Jur. 2d *Witnesses* §§ 148, 149 (1976); Annot., 4 A.L.R.2d 835, § 2 (1949); Annot., 95 L. Ed. 309 (1951).

McCormick describes the privilege as "a late offshoot of an ancient tree"; it is clearly separate and distinct from two rules of the common law which preceded it: (1) the marital

disqualification which prohibited a spouse from testifying in favor of the other spouse, and (2) the privilege of a husband or wife not to testify to any facts against the other — a privilege justified, in part, by a need to preserve marital confidences. McCormick, *supra,* § 78; 8 Wigmore, *supra,* § 2333. Thus, the marital communications privilege was perceived as a rule distinct from the privilege not to testify against a spouse. However, when a trend appeared, in the period from 1840 to 1870, to abolish or restrict these common law marital disqualifications, the present privilege for confidential communications between spouses was enacted, although it existed in principle long before this period.

Maryland first enacted a marital privilege statute for confidential communications between spouses in 1864; at the same time, it provided that husbands and wives were generally competent and compellable to give evidence in the same manner as other witnesses. See ch. 109 of the Acts of 1864. The marital privilege was repealed in 1876 and was not again enacted until 1888. See ch. 545 of the Acts of 1888, and Moser, *Compellability of One Spouse to Testify Against the Other in Criminal Cases,* 15 Md. L. R. 16, 17 n. 4 (1955).

Communications between husband and wife occurring during the marriage are deemed confidential if expressly made so, or if the subject is such that the communicating spouse would probably desire that the matter be kept secret, either because its disclosure would be embarrassing or for some other reason. McCormick, *supra,* § 80. The Court of Appeals of New York, in *Parkhurst v. Berdell,* 110 N. Y. 386, 18 N. E. 123 (1888), held that marital communications were confidential if "expressly made confidential, or such as are of a confidential nature, or induced by the marital relation." 18 N. E. at 127. The same court, in *Poppe v. Poppe,* 3 N.Y.2d 312, 144 N.E.2d 72, 165 N.Y.S.2d 99 (1957), said that the New York statute (which is not dissimilar to our own) was designed to protect and strengthen the marital bond and encompasses only those statements that are " 'confidential,' that are induced by the marital relation and prompted by the affection, confidence and loyalty engendered by such relationship." 144 N.E.2d at 73.

It is not necessary that the spouse claiming the privilege establish the confidential nature of the communication. Generally, the courts have presumed that communications between husband and wife are confidential and privileged, although the circumstances of a given case can negate this presumption. *Pereira v. United States,* 347 U. S. 1, 74 S. Ct. 358, 98 L. Ed. 435 (1954); *Blau v. United States,* 340 U. S. 332, 71 S. Ct. 301, 95 L. Ed. 306 (1951); *Wolfle v. United States, supra;* 8 Wigmore, *supra,* § 2336. The presumption is rebutted where it is shown that the communication was not intended to be confidential, or was made to, or in the presence of a third party. *Pereira v. United States, supra; Wolfle v. United States, supra; Gutridge v. State,* 236 Md. 514, 204 A. 2d 557 (1964); *Master v. Master,* 223 Md. 618, 166 A. 2d 251 (1960); *Metz v. State,* 9 Md. App. 15, 262 A. 2d 331 (1970). For example, the fact that a husband knew that his wife was unable to read without the assistance of a third party would rebut the presumption that a letter which he sent to her was intended to be confidential. *See Grulkey v. United States,* 394 F. 2d 244 (8th Cir. 1968); *State v. Fiddler,* 57 Wash. 2d 815, 360 P. 2d 155 (1961). Similarly, in *State v. Musser,* 110 Utah 534, 175 P. 2d 724 (1946), *vacated on other grounds,* 333 U. S. 95, 68 S. Ct. 397, 92 L. Ed. 562 (1948), a husband's communication to his wife to discuss a matter with certain other individuals was held not confidential.

The Court of Special Appeals held that "because appellant and his wife were not living together, the husband knew that the wife's only means of access to his apartment to retrieve the ring was through a third party, Gloria McCue, who had hidden the ring at appellant's bidding. . . ." Therefore, the court concluded Coleman had knowledge that his communication would be disclosed to a third person.

We cannot agree. Coleman asked his wife to go to his apartment to get the ring which he had stolen from the victim. That this task did not require that Mrs. Coleman repeat the communication to McCue is readily apparent. She could have attempted to gain access to the apartment and look for the ring without assistance, or she might have asked McCue for

the ring without disclosing the substance of her husband's communication. It is unlikely that Coleman intended that his statement be disclosed to McCue, the very person he believed was at that time cooperating with the police. Unlike the cases heretofore cited, Coleman did not suggest that his wife disclose his communication to a third party, nor did the circumstances require a disclosure.

In addition, the nature of the communication indicates that it was intended to remain confidential. *See Blau v. United States, supra.* That is particularly true where, as here, the marital communication amounts to an admission or confession of a crime; in such circumstances, the courts have generally recognized the confidential nature of the communication. *See Stein v. Bowman,* 38 U. S. 209 (13 Pet.), 10 L. Ed. 129 (1839); *Cox v. State,* 192 So. 2d 11 (Fla. Dist. Ct. App. 1966); *Delk v. Commonwealth,* 285 S.W.2d 169 (Ky. 1955); *People v. Oyola,* 6 N.Y.2d 259, 160 N.E.2d 494, 189 N.Y.S.2d 203 (1959); *People v. Fields,* 38 App. Div. 2d 231, 328 N.Y.S.2d 542 (1972), *aff'd* 31 N.Y.2d 713, 289 N.E.2d 557, 337 N.Y.S.2d 517 (1972); *Ward v. State,* 133 Tex. Crim. 110, 109 S.W.2d 207 (1937). We think that the communication in this case was confidential and consequently protected by the statute from disclosure over Coleman's objection.

Nor do we agree with the alternate holding of the Court of Special Appeals that the statute does not apply to confidential communications between spouses in cases where, for all practical purposes, the marriage had ended at the time of the communication. Absent a statutory provision to the contrary, application of the privilege does not depend upon the stability of the marriage, either at the time of the communication or at the time the privilege is asserted. That Coleman and his wife were separated at the time of the communication, or that their marriage had little to commend it, does not bar application of the privilege. *See People v. Oyola, supra.* In *People v. Fields, supra,* the court rejected the argument that the privilege would not apply where the marital relationship no longer had a "genuine existence," citing the practical difficulty a trial judge would have in

determining whether the marriage was viable. The court there said that "whether the public policy engendering the statutory privilege is to be best furthered by limiting its application to such spouses whose marital relationship meets certain tests is peculiarly of legislative concern." 328 N.Y.S.2d 542 at 545. Nor does the fact that Coleman had already been served with divorce papers at the time he claimed the privilege have any bearing on whether the privilege exists. *See Muetze v. State,* 73 Wis. 2d 117, 243 N.W.2d 393 (1976); *Pereira v. United States, supra.* In holding that the status of Coleman's marriage was such that the statutory privilege would not be subserved by suppressing his confidential communications with his wife, the Court of Special Appeals placed reliance upon *McEntire v. McEntire,* 107 Ohio St. 510, 140 N. E. 328 (1923), and *McNamara v. McNamara,* 99 Neb. 9, 154 N. W. 858 (1915). We think neither case is apposite. In *McEntire,* an express statutory provision was involved which provided that parties in a divorce proceeding were competent to testify, notwithstanding their marital relation, to the same extent as any other witness. In *McNamara,* the court simply concluded that a threatening letter sent by one spouse to the other was not a confidential communication.

It may be, as the Attorney General suggests, that where there is no actual marital relationship to preserve and protect, that public policy dictates not permitting the privilege to become an obstruction to the administration of justice. That argument, quite obviously, should be addressed to the legislature, not the courts.

We think the Court of Special Appeals was also wrong in concluding that the privilege is not applicable where the confidential communication is made in furtherance of a crime. The question was presented in *Gutridge v. State,* 236 Md. 514, 204 A. 2d 557 (1964), but it was unnecessary that we decide it in that case.

By statute in California there is an express statutory exception to the privilege between spouses for confidential

communications made in furtherance of a crime. Authorities interpreting that state's law, which were relied upon by the Court of Special Appeals for its holding, are therefore wholly inapplicable, since the Maryland statute contains no such exception. Absent such an exception, the rule is that the privilege is applicable. *See State v. Pizzolotto,* 209 La. 644, 25 So. 2d 292 (1946); *Dickinson v. Abernathy Furniture Co.,* 231 Mo. App. 303, 96 S.W.2d 1086 (1936). *Cf. Fraser v. United States,* 145 F. 2d 139 (6th Cir. 1944). Indeed, the Maryland legislature has recognized the need for an express exception to a statutory privilege protecting communications between accountants and their clients. *See* § 9-110 (b) of the Courts Article, excepting from the privilege matters which "affect the criminal laws of this state."

As indicated, the Maryland statute protecting confidential marital communications, § 9-105 of the Courts Article, states: "One spouse is not competent to disclose any confidential communication between the spouses occurring during their marriage." Unlike § 9-109 of the Courts Article, involving privileged communications between patient and psychiatrist or psychologist, which contains seven express exceptions, no express exceptions are included in § 9-105.

It is elementary that a statute should be construed according to the ordinary and natural import of the language used unless a different meaning is clearly indicated by its context, without resorting to subtle or forced interpretations for the purpose of extending or limiting its operation. *State v. Fabritz,* 276 Md. 416, 348 A. 2d 275 (1975); *Slate v. Zitomer,* 275 Md. 534, 341 A. 2d 789 (1975). In other words, a court may not as a general rule surmise a legislative intention contrary to the plain language of a statute or insert exceptions not made by the legislature. *St. Paul Fire & Mar. v. Ins. Comm'r,* 275 Md. 130, 339 A. 2d 291 (1975); *Amalgamated Ins. v. Helms,* 239 Md. 529, 212 A. 2d 311 (1965). Indeed, in *Birmingham v. Board,* 249 Md. 443, 239 A. 2d 923 (1968), it was evident that twelve words were inadvertently omitted from a statute authorizing the State to incur a certain debt; the effect of the omission was to render the statute

unconstitutional on its face. The Court there held that the question was not one concerning construction of the statute, or whether true legislative intent should prevail over precise grammatical construction or literal intent, but whether the Court was empowered to enlarge upon the statute by including language presumably omitted by inadvertence. In refusing to supply the missing language by judicial construction, the Court held that since it could not invade the function of the legislature, it had no power to correct an omission in the language of a statute even though it appeared to be the obvious result of inadvertence.

In the oft-cited case of *Schmeizl v. Schmeizl,* 186 Md. 371, 46 A. 2d 619 (1946), our predecessors were urged, on grounds of public policy, to import an exception into a statute not evident by its plain language. The Court referred with emphatic disapproval to the practice of the early English judges in disregarding the letter of a statute and extending its provisions to cases which in their judgment, on grounds of reason and justice, were within the mischief which the law was designed to remedy, but for which express provision had not been made by the legislative body. The Court said, at 375, that "the doctrine giving the judge power to mould the statute in accordance with his notions of justice has no place in our law." We thus decline the State's invitation to engraft the two exceptions upon which it relies into § 9-105.[2]

The record indicates, independent of Mrs. Coleman's testimony, that there were two eyewitnesses to the crimes, that the victim's torn clothing was found in Coleman's apartment, together with the stolen money, and that the ring was also recovered from McCue, to whom Coleman had entrusted it. Coleman did not testify and his only witness was a character witness. The State did not, however, file a cross-petition for certiorari raising the harmless error issue, and we therefore will not consider it. *Dempsey v. State,* 277 Md. 134, 355 A. 2d 455 (1976). Nor will we remand the case

---

2. McCormick, *supra,* § 84 and Wigmore, *supra,* § 2338 suggest the existence of a narrow common law exception to the marital communication privilege in instances involving prosecution of one spouse for offenses against the other, or in criminal conversation or alienation of affection cases.

to the Court of Special Appeals to consider that question since the State failed to raise the issue before that court.

> *Judgment of the Court of Special Appeals reversed; case remanded to that court with directions that it remand the case to the Criminal Court of Baltimore for a new trial; costs to be paid by the Mayor and City Council of Baltimore.*