JOHN WESLEY TURPIN *vs.* THE STATE OF MARY-
LAND.

*Peremptory Challenges—1872, ch. 40—Evidence—1864, ch. 109,
and 1876, ch. 357.*

At the trial of the appellant for murder, one of the panel of jurors
was called, and being sworn and examined upon his *voir dire*, it
was determined by the Court that he was an impartial juror; the
prisoner then moved the Court to require the State to exercise its
right of peremptory challenge before he should be required to
exercise that right. But the Court overruled the motion, and in
conformity to its uniform practice required the prisoner to exercise
his right of peremptory challenge before the State was called on to
exercise its right. Whereupon the prisoner excepted. HELD:

That this ruling furnished no cause for reversal.

The Act of 1872, ch. 40, relating to peremptory challenges, does not
prescribe the order in which challenges shall be made, or direct
whether the State or the prisoner shall first exercise the right. It
would seem, therefore, that the course of proceeding in this respect
is left to the discretion of the Circuit Court. It appears, that the

practice in the circuits has not been uniform, while in several of them the practice has been to require the State to challenge first, in the City of Baltimore, and in the first and fourth circuits a different rule has prevailed.

Evidence offered by the defence on an indictment for murder, which was mere matter of inducement, and not part of the *res gestae*, and would be mere hearsay and immaterial to the issue in the cause, was properly excluded.

Evidence offered by the defence on an indictment for murder, to the effect that the deceased prior to the homicide, threatened the defendant's life is inadmissible, unless proof be first given that there was an overt act of attack, and that the defendant at the time of the collision, was in apparent imminent danger.

On an indictment for murder, the prisoner's wife was called for the defence, but was properly not permitted to testify. A wife has not been made competent in such a case by the Acts of 1864, ch. 109, and 1876, ch. 357.

APPEAL from the Circuit Court for Wicomico County.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., MILLER, ALVEY and ROBINSON, J. for the appellee, and submitted for the appellant.

*Henry Page* and *John W. Crisfield,* for the appellant.

*John H. Handy* and *Charles J. M. Gwinn, Attorney-General,* for the appellee.

BARTOL, C. J., delivered the opinion of the Court.

The appellant was indicted in the Circuit Court for Wicomico County for the murder of William F. Farrington, and was found guilty of murder in the second degree. During the trial he took six bills of exceptions to the rul-

ings of the Court below, which are brought before us for review on this appeal.

*First Exception.*—One of the panel of jurors was called, and being sworn and examined upon his *voir dire*, it was determined by the Court that he was an impartial juror; the prisoner then by his counsel, moved the Court to require the State to exercise its right of peremptory challenge, before the prisoner should be required to exercise that right. But the Court overruled the motion, and required the prisoner to exercise his right of peremptory challenge before the State was called on to exercise its right; whereupon the prisoner excepted.

It is stated in the bill of exceptions that this ruling was in conformity to the uniform practice in that Court.

"Peremptory challenges are those which are made to the juror, without assigning any reason, and which the Courts are bound to respect." 1 *Ch. Crim. L.*, 534 m.

"The right of peremptory challenge is deemed a most essential one to a prisoner, and is highly esteemed and protected in law. It is the right to exclude from the panel those who may be suspected of entertaining a prejudice against a party, where sufficient reasons cannot be given for their exclusion for cause." *Proffat on Jury Trials, sec.* 155.

This right of challenge in capital cases, was recognized in England for a long period of time, to the number of thirty-five. It has since been regulated there by various statutes, which need not be here referred to. In this State it has been secured to the prisoner by the Acts of 1737, ch. 2, 1744, ch. 20, 1751, ch. 14, 1809, ch. 138, sec. 13, 1816, ch. 45. By the Act of 1841, ch. 162, the right of peremptory challenge was extended to every person indicted for any crime or misdemeanor, the punishment whereof was confinement in the penitentiary. This Act was incorporated in the Code, Art. 50, sec. 15, which provides further that the accused shall not challenge

more than *twenty* jurors without assigning cause. So stood the law before the *Act of* 1872, *ch.* 40. This was an act to repeal *sec.* 15, *Art.* 50, of the Code, and to re-enact the same with amendments, giving to the State the right of peremptory challenge in certain cases, and it provides "That the right of peremptory challenge shall be allowed to any person who shall be tried on presentment or indictment for any crime or misdemeanor, the punishment whereof, by law, is death, or confinement in the penitentiary, and to the State on the trial of such indictment or presentment; but the accused shall not challenge more than *twenty*, nor the State more than *four* jurors, without assigning cause."

Before this Act was passed, no right of peremptory challenge by the State existed in Maryland; except in the City of Baltimore under the Act of 1860, ch. 308, sec. 18. (2 *Code, sec.* 618.)

By the common law the prosecution in criminal cases could exercise on behalf of the crown peremptory challenges to an unlimited extent, without alleging any other reason than " *quod non boni sunt pro rege.*" *Proffat, sec.* 159.

This was changed by the *Statute of* 33 *Edw.*, 1, *ch.* 4, which while it took away from the crown, the unlimited right of peremptory challenge, was construed by the Courts to allow the prosecution a qualified right of peremptory challenge, which was exercised by allowing the prosecution the privilege of setting aside jurors when called, without assigning cause, until the panel was exhausted, when if the full number was obtained, such jurors were not called, but if not, their names were afterwards called on the general list. *Reg. vs. Frost*, 9 *C. & P.*, 136; *Mausel vs. The Queen*, 8 *E. & B.*, 54.

In *Brandreth's case*, the question arose whether the prisoner should be required to exercise his right of peremptory challenge, before the right of challenge was

30                v. 55.

exercised by the crown, and after full argument, it was decided that according to the uniform practice, the right must first be exercised by the prisoner.   32 *State Trials,* 771, 774, 775.

A similar decision had been made in *Layer's Case,* 16 *State Trials,* 135.

We refer also to *State vs. Bone,* 7 *Jones' Law R.,* 121.

In *Jones vs. The State,* 2 *Blatchford,* 475, the same question here presented arose under the Indiana Statute. The Circuit Court overruled the motion of the defendant that the State's Attorney should be required first to accept or reject the juror, before the defendant should be called on to make his election, and certain jurors after they had been accepted by the defendant, were set aside by the prosecuting attorney, which was alleged as error.   The appellate Court in disposing of the question, said :   " The only question on this point is who shall first make his challenge ?   If this were a new question, and we had it to settle, we should say that the State ought first to make her challenges, but as all the English authorities establish a different doctrine, and no American cases have been seen by us to authorize a different practice, we are bound for the present to sanction what the Circuit Court has done."

In *State vs. Hays,* 23 *Missouri R.,* 287, a similar question arose.   The Missouri statute like our act of 1872, allowed the accused twenty peremptory challenges and the State four, the prisoner moved that the State should be required to exercise its right of challenge first, this was overruled and the panel or list of jurors, was furnished to the State's attorney and to the prisoner, and each was required to exercise their right of peremptory challenge at the same time, by striking from the list of thirty-six jurors, the objectionable names, neither knowing which had been stricken by the other.   This was alleged as error and cause of reversal.   The Supreme

Court speaking by Judge RYLAND said : "We do not think this such an error as would justify the court in revers- ing. The prisoner does not appear to have been deprived of any legal right. In what order the parties shall exer- cise this right, is a matter within the discretion of the Cir- cuit Court. The simplest rule upon this subject, and one to which there would seem to be no objection, is that of requiring the parties to challenge as the jurors are called, and pronounced qualified, the plaintiff always speaking first. This rule I believe has been generally practiced, at least as far as my experience upon the Circuit Court ex- tends, I never knew it deviated from, and that experience embraces a period of eighteen years. But as the rule adopted in this case deprives the prisoner of no legal right, and it does not appear that the discretion was exercised oppressively, it forms no ground for reversal. The right of peremptory challenges is a right to reject and not to select a jury."

In *State vs. Steeley*, 65 *Missouri*, 219, it was decided that " in criminal cases the State must announce her peremp- tory challenges of jurors, before the defendant can be required to announce his." But that decision was made under a statute, which in express terms, prescribed that course of proceeding.

The Act of 1872 does not prescribe the order in which the challenges shall be made, or direct whether the State or the prisoner shall first exercise the right. It would seem, therefore, that the course of proceeding in this re- spect is left to the discretion of the Circuit Court. It appears from the statements of my brothers, who preside in the circuits, that the practice has not been uniform ; while in several of the circuits the practice has been to require the State to challenge first ; in the City of Balti- more, in the fourth circuit, and in the circuit from which this appeal comes, a different rule has prevailed. But it seems to us very clear that the action of the Circuit Court

on this question can furnish no ground for reversal. The appellant has not been deprived of any legal right. His complaint is that by the ruling of the Court below, after having accepted certain jurors, they were challenged by the State, and he was thus deprived of jurors of his selection. But the law gives him the right only to reject, not to select the jurors. This subject was fully considered in the able opinion of Judge STORY in *U. States vs. Marchant and Colson*, 12 *Wheaton*, 480. There two parties were indicted jointly and claimed the right to sever, and be tried separately; this was denied, and this ruling was alleged as error. But the Court held it was not error to require them to be tried together. If tried in that way, it was conceded that each of the accused had the right to challenge the whole number allowed by statute, and it was contended on the part of the accused, that as one might desire to retain a juror who is challenged by the other, and if challenged by one he must be withdrawn as to both, and thus the right of selection would be virtually impaired. In answer to this argument the learned judge said: " But it does not appear to us that this reasoning can, upon the principles of the common law be supported. The right of peremptory challenge, is not of itself a right to select, but a right to reject jurors. It excludes from the panel those whom the prisoner objects to, until he has exhausted his challenges, and leaves the residue to be drawn for his trial, according to the established order and usages of the Court. The elementary writers nowhere assert a right of this nature in the prisoner, but uniformly put the allowance of peremptory challenges upon distinct grounds. Mr. Justice Blackstone in his commentaries, (4 *Bl. Com.*, 353) puts it upon the ground, that the party may not be tried by persons against whom he has conceived a prejudice, or who if he has unsuccessfully challenged them for cause, may on that account conceive a prejudice against the prisoner. The right, therefore, of

challenge does not necessarily draw after it the right of selection, but merely of exclusion. It enables the prisoner to say who shall not try him; but not to say who shall be the particular jurors to try him. The law presumes that every juror sworn in the case is indifferent, and above legal exception; for otherwise he may be challenged for cause."

The reasoning of the learned judge is applicable to the question before us. The only ground of objection to the ruling of the Circuit Court, urged by the appellant, is that he was thereby deprived of jurors, who were acceptable to him; but it is obvious that the same result might follow, whether the right of challenge by the State be exercised before or after the prisoner has spoken. In either case the prisoner would not be deprived of any legal right, which as we have seen is not a right to *select* the jurors, but simply to *reject* such as he may consider objectionable, to the number of twenty. This privilege was enjoyed by the appellant without restriction.

And as the statute does not prescribe the order in which the challenges shall be made by the prisoner and the State respectively, the determination of that question was left to the judgment and discretion of the Circuit Court.

It follows that the ruling contained in the *first bill* of *exceptions*, furnishes no cause for reversal.

*The second bill of exceptions* was taken to the exclusion by the Circuit Court of the conversation between *George Brown*, one of the farm hands of the deceased, and *Columbus Horsey*, one of the witnesses for the State, which took place on the morning of the day when the deceased was killed. This testimony was offered by the defence on the cross examination of *Columbus Horsey*, who was an eye witness of the homicide. The witness on his examination in chief was asked, " how came you to be there?" and answered, " George Brown told me Mr. Farrington was going after his pigs." On cross-examination he was

asked by the prisoner's counsel, " to state all that conversation, in which he had stated that George Brown had told him that Mr. Farrington was going after his pigs."

To which question the State by its counsel objected, which objection the Court sustained, on the ground that the question of the State put to the witness, and his answer as far as it went, was mere matter of inducement, and that the balance of the conversation was not part of the *res gestæ,* and would be mere hearsay, and immaterial to the issue in the cause, whereupon the prisoner by his counsel excepted.

There can be no doubt or question of the correctness of this ruling; and for the reasons assigned by the Circuit Court, the testimony was properly excluded.

The same may be said of the ruling in the *third bill of exceptions,* which presents the same question. The same witness was asked, " what information was given him by Brown, in that conversation with him about Farrington going after his pigs." The counsel of the prisoner being asked what the object of the question was, stated that " they wanted to know all that Brown said of the deceased's purposes in going after his pigs, including his manner and language in the declaration of such purposes." This was excluded and very properly as such testimony would be mere hearsay, and wholly immaterial. In the argument of the cause in this Court, no point has been made by the appellant's counsel, upon the second and third bills of exceptions, and no argument is needed to show that there was no error in the rulings of the Circuit Court upon the questions therein presented.

*Fourth bill of exceptions.*—It appears from the facts stated in the *second bill of exceptions,* that the killing of the deceased by the appellant was proved by the witness, *Ashby Turpin,* who also proved the circumstances which preceded and attended the homicide. It appears from his testimony, that there were some pigs on the farm of the

appellant which were claimed by the deceased, that the latter had sent the witness and *George Brown*, one of the farm hands of deceased, in the morning to get the pigs, and the appellant prevented the men from taking them; when the deceased was informed of this, he became excited, and called on his wife for his revolver, which she at first refused to get for him, but on being assured that he would not use it except in self defence, she got it and gave it to him, and he expressed his determination to have his pigs; the deceased afterwards asked witness to go with him after dinner to get the pigs.

Evidence was also given by witnesses introduced by the State, tending to show that George Brown, Thomas Handy, Archelaus Rounds and Ferdinand Goslee, were farm hands of Farrington, (the deceased,) at his residence, of whom Thomas Handy and Archelaus were summoned by deceased, through the witness, Ashby Turpin, to go with deceased and witness after the said pigs; and that Brown and Goslee watched them as they went; that the deceased carried with him his revolver, in his left breast under his vest; and followed by Handy and Rounds went to the premises, and against the protest of the appellant, attempted to drive off certain hogs, and at the gate of the appellant leading into the county road, and on the inside thereof, the deceased was killed by the discharge of a gun, in the hands of the appellant. *Columbus Horsey*, Ashby Turpin, Thomas Handy, Archelaus Rounds and Nannie Turpin, daughter of appellant, were present and testified to the circumstances of the killing; their testimony, except that of Ashby Turpin and Columbus Horsey is not contained in the record. It appears by the *fourth* bill of exceptions that George Brown, a witness for the State, on his cross-examination after testifying to substantially the same facts as had been deposed to by the witness Ashby Turpin, as to what took place after the witness and Ashby Turpin returned from the farm of the

appellant and informed the deceased of their failure to-
get the pigs, further testified that after deceased got the
revolver from his wife, he asked witness if he had any
caps and lead, that witness replied that he had caps but
no lead, deceased then asked witness to bring him six or
seven caps, which witness afterwards did. Later, on the
same day, deceased asked witness to go over to Turpin's
with him after the pigs, and on witness declining, de-
ceased asked him "if he was afraid?" to which witness
replied, "no, I am not afraid, but Turpin has told me not
to go on his land again, and I am not going." On the
same morning Columbus Horsey came to the corn field of
the deceased, where the deceased was, and the two talked
together about an hour; Horsey then came to him, wit-
ness, and witness told him that deceased was going over
to Turpin's that day for the pigs.

The prisoner then proved by *William Brown,* that after-
breakfast, the witness with his brother George Brown,
returned to Farrington's house, George carrying with him
the pistol caps, which were delivered to the deceased; at-
that time Farrington was attempting to fire at a post;
that later in the day witness saw the deceased and Ashby
Turpin, followed by Tom Handy and Archelaus Rounds
go over to Turpin's, and soon after saw Mrs. Farrington,
wife of the deceased, proceeding in the direction of Tur-
pin's, who went as far as the line fence which divided the
premises of the deceased from those of the prisoner; that-
witness saw the deceased and parties with him, and also
the prisoner and family moving about the premises of the
prisoner, but was too distant to hear any words, saw them
move into the lane towards the gate; heard the explosion
of the gun at the gate, and immediately ran to the spot,
and found the deceased lying on the ground near the
gate in a dying condition, with a large revolver in the
bosom of his coat, on the left side, which said revolver
seemed to be the same that witness had seen the deceased
have early in the day.

The traverser then introduced Alexander Goslee, a competent witness and offered to prove, that on the morning of the same day, before noon, the deceased came to the store of witness in the town of Quantico, two miles from the residence of the deceased, and applied for the purchase of shot, and the largest he had, which witness sold him; and at the same time the prisoner stated he would follow up the said evidence, with further evidence, that about two months before, the deceased and the prisoner had a quarrel on the public road, in the course of which, and as they separated, the deceased declared he would be prepared for him (the prisoner) as he returned, and that the prisoner had been informed on the day of the shooting by his son, that he had that day met the said deceased on the road to Quantico, and that he (the son) suspected the deceased was preparing for him.

To which evidence so offered to be proved by the said Goslee the State objected, which objection the Court sustained, and refused to allow the said evidence to go to the jury, because the purchase of shot by the deceased was not known or communicated to the prisoner, and that several witnesses who were present, had testified to the circumstances of the killing. To this ruling the appellant, by his counsel, excepted.

This exception and the *fifth*, which present similar questions, have been argued together, and will be disposed of in the same way.

*The fifth bill of exceptions* was taken to the exclusion by the Court of evidence offered by the appellant, that in August, 1879, the deceased, with *Brady* the witness, were driving cattle of the prisoner off the premises of the deceased, when the deceased, in conversation with the witness, said, "I don't want his (Turpin's) cattle to trespass on me, nor my cattle to trespass on him; but if he (Turpin) ever crosses my path, I will shoot him as sure as he is a man." There being no proof given or offered that

this threat of the deceased had been communicated to the prisoner, the evidence was excluded.

We are of opinion there was no error in the ruling by the Circuit Court contained in these exceptions.

The purchase by the deceased of shot from the witness Goslee, was in the forenoon of the day, and several hours before the homicide was committed, it is obvious that it was not part of the *res gestæ;* it further appears that it was not known to the appellant, and therefore was not admissible evidence upon any ground. As to the previous threats made by the deceased in his conversation with Brady, these were not known or communicated to the appellant.

This subject is very fully and ably treated in the excellent work by *Wharton on Evidence in Criminal Cases, sec.* 757: "Can evidence," says the learned author, "to the effect that the deceased, prior to the homicide, threatened the defendant's life be received, and if so is it a prerequisite to the proof of such threats that they be shown to have been communicated to the defendant? Certainly, if such evidence is offered to prove that the defendant had a right to kill the deceased, there being no proof of hostile demonstration by deceased, then it is irrelevant." The author proceeds, in the same section, to show that, in some cases, such evidence ought to be received, and cites several authorities. Among these is *Wiggins vs. The People,* 93 *U. S.,* 465, where it was held to be admissible. In that case the Court said, quoting from Wharton, that "It was not relevant to show the *quo animo* of the defendant, but it may be relevant to show that, at the time of the meeting the deceased was seeking defendant's life." There the question, whether the prisoner or the deceased commenced the encounter which resulted in death, was left in doubt, and it was held that in such case previous threats by the deceased, though not communicated to the defendant, were properly admissible in evidence, as tending to show that the encounter

was begun by the deceased, and that the defendant acted in self-defence.

But the rule is correctly stated by Wharton in the same section " that such evidence is inadmissible, unless proof be first given that there was an overt act of attack, and that the defendant, at the time of the collision, was in apparent imminent danger," and for this many cases are cited in note 2.

In this record no such proof appears, the homicide was proved by several eye-witnesses, no evidence appears to have been given of any overt act of attack by the deceased, nor is there any evidence tending to show that the appellant was in any apparent imminent danger. It was shown by the testimony of defendant's witnesses that when the deceased obtained the pistol, he asserted that he would not use it except in self-defence, there was no proof that he drew the weapon upon the appellant, but on the contrary the testimony of William Brown, one of the witnesses for the defence, was that when he was shot down by the appellant, the weapon was in his breast pocket. In the face of this testimony, it is clear, both upon reason and authority, that the evidence offered in the *fifth bill of exceptions* was wholly inadmissible.

The *sixth bill of exceptions* presents the question, whether the wife of the appellant was a competent witness. She was called for the defence, but was not permitted to testify.

By the common law she was not a competent witness, this is conceded ; but it is contended that she has been made competent by our Evidence Acts of 1864, *ch.* 109, *and* 1876, *ch.* 357.

The Act of 1868, ch. 116, simply repealed and re-enacted with amendments the second section of the Act of 1864, it has no application here, and need not be further referred to. The question turns upon the construction of the first and third sections of the Act of 1864, and the Act of 1876.

*The Act of* 1864, *sec* 1, provides " that no person offered as a witness shall hereafter be excluded by reason of

*incapacity from crime or interest,* from giving evidence, &c., in the trial of any issue joined or hereafter to be joined, or of any matter or question, or on any inquiry arising in any suit, action or proceeding, civil or criminal, in any Court, &c., but that every person so offered may and shall be admitted to give evidence, notwithstanding that such person may and shall have an interest in the matter in question, or in the event of the trial of any issue, matter, question or inquiry, or of the suit, action or proceeding in which he is offering as a witness, &c. * * * and the parties litigant and all persons in whose behalf any suit, action or other proceeding may be brought or defended, themselves and their wives and husbands shall be competent and compellable to give evidence in the same manner as other witnesses, except as hereinafter excepted."

The 3*rd section* provides that " no person who in any criminal proceeding, is charged with the commission of any indictable offence, or any offence punishable on summary conviction, shall be competent or compellable to give evidence for or against himself, * * * * nor in any criminal proceeding, shall any husband be competent or compellable to give evidence for or against his wife, nor shall any wife be competent or compellable to give evidence for or against her husband, except as now allowed by law," &c., &c.

The Act of 1876, ch. 357, repealed the 3rd section of the Act of 1864, and enacted in lieu thereof the following:

3. "In the trial of all indictments, complaints and other proceedings against persons charged with the commission of crimes and offences, and in all proceedings in the nature of criminal proceedings, in any Court of this State, &c., &c., the person so charged shall, at his own request, but not otherwise, be deemed a competent witness." * * *

The contention on the part of the appellant is that, under the first section of the Act of 1864, if it had stood alone the party accused, *himself,* or his wife would have been a competent witness; but the *third* section qualified

the provisions of the first, and declared that in criminal cases neither the party himself, nor his wife, should be competent or compellable to testify; and when this *third* section was repealed by the Act of 1876, and the party accused was made a competent witness for himself, it follows that the provisions of the first section of the Act of 1864, in so far as they declared the wife of the accused to be incompetent to testify, being repealed, the provisions of the first section, in that respect, have been left in full force, and therefore the wife of the appellant was a competent witness, and ought to have been allowed to testify in his behalf.

If this construction be sound, it would follow that the wife of the accused would not only be *competent* to testify in his behalf, but would be *compellable* to testify against him—a conclusion which we would hesitate to adopt, unless compelled by the plain meaning and intent of the statutes. But we think this construction is not correct.

The object and intent of the Act of 1864 was to remove the incapacity of persons called to testify, arising from crime or *from their interest in the subject-matter* of the suit.

But the incompetency of a husband or wife to testify for or against each other in a criminal prosecution at the common law arose not from interest in the result of the suit, but was based upon considerations of public policy, growing out of the marital relation; as said by WIGHTMAN, J., in *Stapleton vs. Crofts*, 83 *Eng. C. L. R.*, 369, "from the interest which the public have in the preservation of domestic peace and confidence between married persons." We refer also to *Wharton's Cr. Ev.*, secs. 400, 437; *Lucas vs. Brooks*, 18 *Wall.*, 453; *Steen vs. The State*, 20 *Ohio*, 333.

Looking at the language of the first section of the Act of 1864, we think it very clear that standing alone it would not operate to alter the rule of the common law which made a husband or wife an incompetent witness in a criminal prosecution against the other.

Turpin *vs.* The State.

The words of the section in which *"the parties and their wives and husbands are declared to be competent and compellable to give evidence,"* in our opinion, apply only to civil suits, and have no reference to criminal prosecutions. This is apparent not only from the phraseology of this part of the law, where it speaks of *"the parties litigant"* and of *"persons in whose behalf any suit, action, or other proceeding may be brought or defended,"* language only applicable to civil suits, but also from the terms by which the parties themselves and their wives and husbands are made not only *competent* but *compellable* to testify, a provision which evidently was not intended to apply to criminal prosecutions.

The *third* section was passed to prevent any possible misconstruction of the *first* section in this respect; and when by the Act of 1876 the third section was repealed, and the parties accused were *allowed* to testify in their own behalf, this last Act had no other effect except so far as it related to the parties accused, making them *competent* to testify in their own behalf in criminal cases.

By repealing the *third* section of the Act of 1864 the construction of the *first* section was not changed, and that section, properly construed, did not remove the incompetency of the wife, which existed at the common law, to testify in the case of a criminal prosecution against her husband.

*Rulings affirmed and
cause remanded.*

(Decided 11th February, 1881.)