*Darrayl John Wilson v. State of Maryland*, No. 436, September Term 2018.  Opinion by Beachley, J.

**SPOUSAL PRIVILEGE—SHAM MARRIAGES**

**WITNESS TAMPERING AND OBSTRUCTION OF JUSTICE—CORRUPT MEANS**

Defendant confessed to his girlfriend that he was responsible for a murder. Girlfriend subsequently informed the police, and defendant was charged with that murder. While awaiting the murder trial, defendant attempted to marry girlfriend via a telephone call so that she could invoke her spousal privilege and avoid being compelled to testify against him in defendant's pending murder trial.

In response to defendant's purported marriage to his girlfriend, the State charged defendant with "corrupt means" witness tampering and obstruction of justice—namely for seeking to silence the girlfriend's testimony.  A jury convicted defendant of witness tampering and obstruction of justice, and defendant appealed.

*Held*:  Judgment reversed.  The prevailing rule throughout the country is to allow a spouse to invoke the spousal privilege regardless of the reasons for the marriage— including for the sole purpose of silencing a potential witness.  Prior Maryland cases acknowledged the prevailing rule, but it is now expressly adopted.

In light of adopting the prevailing rule, there can be no "corrupt means" witness tampering or obstruction of justice for simply endeavoring to invoke a legally recognized evidentiary privilege.

Circuit Court for Charles County
Case No. C-08-CR-17-000048

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 436

September Term, 2018

_____

DARRAYL JOHN WILSON

v.

STATE OF MARYLAND

_____

Berger,
Friedman,
Beachley,

JJ.

_____

Opinion by Beachley, J.

_____

Filed: July 30, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

On June 30, 2017, the State charged appellant Darrayl Wilson, by way of indictment, with two counts of obstruction of justice and two counts of witness tampering. In the indictment, the State alleged that appellant "did by corrupt means" try to impede, influence, and obstruct Kearra Bannister from testifying against him by seeking to marry her. On January 18, 2018, a jury sitting in the Circuit Court for Charles County convicted appellant of one count of obstruction of justice and one count of witness tampering. The court sentenced appellant to twenty years' incarceration, all but three-and-a-half years suspended, for witness tampering, and a concurrent three-and-a-half-year sentence for obstruction of justice. Appellant timely appealed and presents the following two issues for our review:

1. Was the evidence sufficient to convict appellant of "corrupt means" witness tampering and "corrupt means" obstruction of justice?

2. Does the sentence for witness tampering merge into the sentence for obstruction of justice?

We conclude, as a matter of law, that appellant's actions do not constitute "corrupt means" as contemplated by the crimes of witness tampering and obstruction of justice. Accordingly, we vacate appellant's convictions, and need not decide the merger issue.

## FACTUAL AND PROCEDURAL BACKGROUND

In August of 2011, Crystal Anderson's mother reported her missing. Unfortunately, in January 2012, Ms. Anderson's body was discovered in Nanjemoy, Maryland, near Purse State Park. The police investigation into Ms. Anderson's death continued for several years.

On August 20, 2014, Charles County patrol officers responded to a "domestic assist" call in Nanjemoy. When the officers arrived, they made contact with Ms. Bannister, who indicated that she had information concerning Crystal Anderson's death. Detective Brian[1] Buchanan interviewed Ms. Bannister that day and recorded the interview. Ms. Bannister told Detective Buchanan that appellant and another man, Raymond Posey, III, shot and killed Ms. Anderson.[2] Ms. Bannister explained that, at the time of Ms. Anderson's murder, she was dating appellant, and that appellant told her about the murder. Ms. Bannister also told Detective Buchanan that she observed appellant and Mr. Posey selling and giving away Ms. Anderson's possessions following her disappearance.

In 2015, the State indicted both appellant and Mr. Posey for crimes related to Ms. Anderson's death.[3] Following his indictment for Ms. Anderson's murder, appellant remained incarcerated in the Charles County Detention Center. From December 2016 through February 2017, appellant engaged in numerous telephone conversations with various individuals discussing his intention to marry Ms. Bannister before the State could compel her to testify against him and Mr. Posey in their respective murder trials. These

---

[1] Detective Buchanan did not provide his first name while on the witness stand at appellant's trial. Consequently, we use the name "Brian" because the prosecutor identified him as "Detective Brian Buchanan" in opening statements.

[2] Ms. Bannister could not remember whether appellant told her that he personally shot Ms. Anderson. In her recorded statement, she indicated that "they"—both appellant and Mr. Posey—shot and killed Ms. Anderson.

[3] The State indicted Mr. Posey in February 2015, and appellant in June 2015.

efforts culminated in appellant "marrying" [4] Ms. Bannister over the telephone on February 9, 2017, three days after the State's murder trial against Mr. Posey had begun, but before Ms. Bannister was called to testify as a State's witness in that trial.

On February 13, 2017, Ms. Bannister took the witness stand in the State's prosecution of Mr. Posey. During the State's direct examination, the prosecutor asked Ms. Bannister questions about appellant, and Ms. Bannister responded by stating that she wished to invoke her newly-acquired spousal privilege. Presumably, Ms. Bannister sought to invoke Md. Code (1973, 2013 Repl. Vol.), § 9-106(a) of the Courts and Judicial Proceedings Article ("CJP"), which generally provides that the spouse of a person on trial for a crime may not be compelled to testify as an adverse witness. [5] The trial judge responded that Ms. Bannister held no such privilege and required her to answer the prosecutor's questions.

Following Mr. Posey's trial, the State filed a Motion to Preclude Assertion of Spousal Privilege in appellant's own murder case. In an order dated July 10, 2017, the circuit court granted the State's motion, ruling that appellant's marriage to Ms. Bannister was invalid. Appellant appealed that decision to our Court, and in an unreported opinion,

---

[4] The "marriage ceremony" took place over the telephone via a conference call, with a pastor from New Jersey officiating. Ms. Bannister called in from her workplace while appellant called from the detention center. As we shall explain, because we hold as a matter of law that appellant's apparent efforts to take advantage of the spousal privilege do not constitute the "corrupt means" contemplated by the witness tampering and obstruction of justice statutes, we need not decide whether this ceremony constituted a valid marriage in Maryland.

[5] The privilege is subject to certain exceptions that do not apply here.

3

*Wilson v. State*, No. 1122, Sept. Term, 2017 (filed June 18, 2018), a panel of this Court dismissed the appeal, holding that appellant not only lacked standing, but that he had improperly appealed from a non-final judgment.

In June 2017, the State issued a separate indictment against appellant, charging him with obstruction of justice and witness tampering in both Mr. Posey's murder trial and his own pending murder prosecution.[6]  Appellant's trial on these charges began on January 16, 2018.  Two days later, the jury acquitted appellant of obstruction of justice and witness tampering in the State's case against Mr. Posey, but convicted appellant of obstruction of justice and witness tampering in his own murder case.  This appeal concerns only the propriety of appellant's convictions for obstruction of justice and witness tampering.

## **DISCUSSION**

In its brief, the State succinctly summarizes the issue for our review: "whether, viewed in the light most favorable to the State, there is any evidence from which a reasonable jury [could] conclude that Wilson's course of conduct culminating in the telephonic marriage reflected the corrupt intent necessary for conviction under the obstruction of justice and witness-tampering statutes."  (Footnote omitted).  The "course of conduct" the State refers to is appellant's intent and actions to marry Ms. Bannister for the sole purpose of enabling her to invoke her spousal privilege and not testify against him.

We shall follow the out-of-state courts that have declined to create a judicial

---

[6] According to the State's brief, appellant's trial for Ms. Anderson's murder has been postponed several times, and is currently scheduled for October 28, 2019.

4

exception to the spousal privilege and hold that a spouse may invoke the privilege even in the context of a sham marriage. Accordingly, we conclude that, even assuming appellant entered into a sham marriage for the purpose of allowing Ms. Bannister to invoke her spousal privilege, his actions and intentions do not satisfy the "corrupt means" element of "witness tampering" or "obstruction of justice."[7]

### *The Spousal Privilege*

"The history of the privilege not to testify against one's wife or husband is involved . . . in a tantalizing obscurity." 8 John Henry Wigmore, *Wigmore on Evidence* § 2227 at 211 (McNaughton Rev. 1961). Although it is unknown when the privilege came to be, it "may be said to have been understood to exist in some shape before the end of the 1500s and to have been firmly established by the second half of the 1600s." *Id*. at 213. The Court of Appeals acknowledged the unclear origin of the spousal privilege in *Brown v. State*, a case concerning the related "confidential communications privilege" now codified at CJP § 9-105.[8] 359 Md. 180, 189-90 (2000). There, the Court noted that, dating back to English common law, "[t]he earliest root seems to be the privilege that a husband had to preclude adverse testimony by his wife." *Id*. 190 (citing Wigmore, *supra*, § 2227 at 211). Like its

---

[7] We note that appellant disputes that his marriage is a sham. In his brief, he claims that "[he] married a woman whom he had known intimately for many years, and who was the mother of his two children." Whether appellant and Ms. Bannister entered into a sham marriage is irrelevant to our decision in this case.

[8] The confidential communications privilege provides that "One spouse is not competent to disclose any confidential communication between the spouses occurring during their marriage." CJP § 9-105. *See generally State v. Sewell*, 463 Md. 291 (2019).

date of origin, the actual policy reasons underlying the privilege similarly remain unknown.

In his treatise on evidence, Professor Wigmore posited that

> Possibly the true explanation is, after all, the simplest one, namely, that a natural and strong repugnance was felt (especially in those days of closer family unity and more rigid paternal authority) to condemning a man by admitting to the witness stand against him those who lived under his roof, shared the secrets of his domestic life, depended on him for sustenance and were almost numbered among his chattels.

Wigmore, *supra*, § 2227 at 212.

Whatever its source and rationale, the spousal privilege was first codified in Maryland in 1864 when the General Assembly rewrote the first five sections of Evidence Code, Article 37. *Brown*, 359 Md. at 195. In adopting § 3 to Article 37 in 1864, the legislature enacted the following language:

> No person who, in any criminal proceeding, is charged with the commission of any indictable offence, or any offence punishable on summary conviction, shall be competent or compellable to give evidence for or against himself, nor shall any person be compellable to answer any question tending to criminate himself, *nor, in any criminal proceeding, shall any husband be competent or compellable to give evidence for or against his wife, nor shall any wife be competent or compellable to give evidence for or against her husband, except as now allowed by law*, nor in any case, civil or criminal, shall any husband be competent or compellable to disclose any communication made to him by his wife during the marriage, nor shall any wife be compellable to disclose any communication made to her by her husband during the marriage.

(Emphasis added). Notably, the original privilege precluded a spouse from testifying either for or against the other spouse—the spouse was neither competent nor compellable.

One of the earliest interpretations of the spousal privilege is found in *Turpin v. State*, 55 Md. 462 (1881). There, John Turpin, who was accused of murder, unsuccessfully

sought to call his wife to testify in his defense. *Id*. at 475. Following his conviction, the Court of Appeals was tasked with interpreting the effect of the Act of 1876, ch. 357, which repealed Article 37 § 3 of the 1864 Act and instead provided:

> 3. "In the trial of all indictments, complaints and other proceedings against persons charged with the commission of crimes and offences, and in all proceedings in the nature of criminal proceedings, in any Court of this State, &c., &c., the person so charged shall, at his own request, but not otherwise, be deemed a competent witness."

*Id*. at 476. Mr. Turpin argued that by repealing Article 37 § 3 of the Act of 1864, his wife became a competent witness under § 1 of the Act of 1864. *Id*. at 476-77. That section addressed who could be called as a witness and provided that "the parties litigant and all persons in whose behalf any suit, action or other proceeding may be brought or defended, themselves and their wives and husbands shall be competent and compellable to give evidence in the same manner as other witnesses, except as hereinafter excepted." *Id*. at 476.

The Court of Appeals rejected Mr. Turpin's interpretation of the effect of the 1876 amendment, holding that § 1 of Article 37 only applied in civil actions, and that it "would not operate to alter the rule of the common law which made a husband or wife an incompetent witness in a criminal prosecution against the other." *Id*. at 477-78. Instead, the Court concluded that the effect of the 1876 amendment to Article 37 § 3 was to allow a criminal defendant to testify in his own defense, not to remove "the incompetency of the wife, which existed at the common law, to testify in the case of a criminal prosecution against her husband." *Id*. at 478.

7

In 1888, the General Assembly again amended the law. This time, the legislature "added back to § 3 of Article 37 the provision that, '[i]n all criminal proceedings the husband or wife of the accused party shall be competent to testify[.]'" *Brown*, 359 Md. at 196.

> As a result of the 1888 amendment, the law, as ultimately codified in Maryland Code Article 35, §§ 1 and 4 (1957) was that (1) spouses were generally competent and compellable witnesses; (2) in criminal proceedings, the spouse of the defendant was "competent to testify," but (3) "in no case, civil or criminal, shall any husband or wife be competent to disclose any confidential communication made by the one to the other during the marriage." The law remained in that state until 1965, when the Legislature added to what was then § 4 of Article 35 the provision that a person could not be compelled to testify as an adverse party or witness in any criminal proceeding involving the person's spouse.

*Id*. at 197.

Between 1888 and 1965, the Maryland Code acknowledged a spouse's competency to testify in criminal proceedings, but did not specifically provide whether a spouse could invoke the privilege to prevent being compelled to testify. Despite this silence, the Court of Appeals nevertheless construed the Code as recognizing the existence of the spousal privilege. *See Raymond v. State ex rel. Younkins*, 195 Md. 126, 128-29 (1950) (recognizing that where husband abused wife, wife was a competent witness, free to decide whether she would testify against her husband in trial for criminal abuse); *see also Richardson v. State*, 103 Md. 112, 117 (1906) (stating that wife of criminal defendant was a competent witness who was free to testify against him "although she could not have been compelled to testify").

In 1971, the General Assembly amended Article 35 § 4 by providing that neither a husband nor wife could be compelled to testify as an adverse party in any criminal proceeding involving his or her spouse unless the proceeding involved abuse of a child under the age of sixteen. The legislature again amended Article 35 § 4 in 1973 to provide that a husband or wife could be compelled to testify against his or her spouse in criminal proceedings involving abuse of a child under the age of eighteen.

As part of the recodification of the Maryland Code, in 1973 the General Assembly enacted the Courts and Judicial Proceedings Article. For the first time, the legislature gave the spousal privilege its own section, codified at § 9-106. That section provided "The spouse of a person on trial for a crime may not be compelled to testify as an adverse witness unless the charge involves the abuse of a child under 18." In 1994, in an apparent effort to combat domestic violence, the General Assembly narrowed the privilege by allowing the State to compel a spouse to testify as an adverse witness when the spouse was the victim of assault and battery in certain circumstances.

Despite legislative amendments subsequent to 1994 that created exceptions for spouses who are assault victims, the general rule that a spouse may not be compelled to testify as an adverse witness has remained in Maryland since 1864. Having established that the spousal privilege has existed in Maryland for over 150 years, we next turn to consider whether the privilege applies in a sham marriage, *i.e.*, where the parties marry with the intent and purpose of invoking the privilege in a criminal proceeding.

9

*The Prevailing Rule: Recognizing the Spousal Privilege in Sham Marriages*

Although Maryland courts have not addressed whether a spouse may successfully invoke the privilege in a sham marriage, our dicta in *Hagez v. State*, 110 Md. App. 194, 211 n.7 (1996), suggests that the privilege may be invoked. There, the State charged Adel Hagez with first-degree murder, and his wife attempted to invoke her spousal privilege not to testify against him. *Id*. at 197-98, 207-08. The couple had divorced approximately two years prior to the murder trial, but Mr. Hagez presented evidence that he remarried his wife three days before the trial began. *Id*. at 207-08. Although evidence of the remarriage contained apparent inconsistencies, the trial court assumed a valid marriage and nevertheless ruled that Ms. Hagez could not invoke the privilege because "the purpose of the marriage was to hinder justice by preventing Ms. Hagez's testimony if asserted." *Id*. at 209.

Because we reversed Mr. Hagez's conviction on other grounds, we did not reach the issue of "whether the statutory testimonial privilege is available to a witness who has married solely to assert the spousal privilege or to obstruct justice." *Id*. at 211. We offered some guidance on the topic, however, in a footnote. We observed that the ability to invoke the privilege seemed to only depend upon the existence of a valid marriage, not upon the reasons for the marriage:

> We note that the spousal privilege, codified in [CJP] § 9-106, does not seem to include any exceptions concerning an improper motive or purpose in marrying. Rather, it appears to pertain to anyone who qualifies as a "spouse," without regard to the motive for the marriage. Thus, one who marries for money, or to enhance one's career, or for estate purposes, seemingly would be entitled to invoke the privilege, so long as the marriage

10

is valid; the statute does not specifically authorize a trial court to go behind the marriage to discern its validity or to pass judgment on the reasons for the marriage.

*Id.* at 211 n.7. This language, though dicta, supports the conclusion that the ability to invoke the spousal privilege should not depend on the underlying reason for the marriage. Instead, it appears that the only relevant factor in deciding whether a party may assert the spousal privilege is whether the marriage is valid.

The *Hagez* footnote further acknowledged that this principle appeared consistent with application of the confidential communications privilege. We noted that "application of [that] privilege does not depend upon the stability of the marriage, either at the time of the communication or at the time the privilege is asserted." *Id.* (quoting *Coleman v. State*, 281 Md. 538, 544 (1977)). Recognizing a potential flaw with the scope of the confidential communications privilege, we noted, "It may be . . . that where there is no actual marital relationship to preserve and protect, that public policy dictates not permitting the privilege to become an obstruction to the administration of justice. That argument, quite obviously, should be addressed to the legislature, not the courts." *Id.* (quoting *Coleman*, 281 Md. at 545). This language suggested that the spousal privilege, like the confidential communications privilege, can be invoked, even if the marriage is a sham.[9]

Nearly a year after *Hagez*, the Court of Appeals decided *State v. Walker*, 345 Md. 293, 325 (1997), a case concerning the "exceptional circumstances" hearsay exception. In

---

[9] The footnote in *Hagez* also references contradictory authority, namely *Lutwak v. United States*, 344 U.S. 604 (1953), and *Osborne v. State*, 623 P.2d 784 (Alaska 1981). We shall address these cases in further detail below.

11

*Walker*, the Court mentioned, without explicitly holding, that the prevailing rule throughout the country seemed to be that the spousal privilege applied, even in a sham marriage.

> There have, to be sure, been cases in which the defendant and the witness have entered into a marriage immediately prior to trial, the inference being that the marriage was a sham, arranged solely to preclude the witness from testifying or having to testify. Most of those cases seem to have arisen under the common law rule that either made the spouse incompetent as a witness or allowed the defendant to preclude the testimony. *See* Michael G. Walsh, *Existence of Spousal Privilege Where Marriage Was Entered Into For Purpose of Barring Testimony,* 13 A.L.R.4th 1305 (1982). Some courts, in that circumstance, have refused to apply the privilege, although *the prevailing rule seems to be, even in that circumstance, that the privilege applies. Id.* at 1308.

*Id*. at 330 (emphasis added). Our research vindicates the *Walker* Court's assessment of the prevailing rule, as many states allow a spouse to invoke the spousal privilege even in the context of a sham marriage.

In *State v. Peters*, 444 S.E.2d 609, 610 (Ga. Ct. App. 1994), Georgia's intermediate appellate court concluded that the spousal privilege "may be invoked regardless of the underlying motives for a valid, existing marriage." There, the State charged Linda Peters with murdering her husband. *Id*. Eleven days after the murder, Walter Sargent, who was having an affair with Ms. Peters, finalized his own divorce. *Id*. Before she married Mr. Sargent, Ms. Peters "told her daughters she probably would have to marry [Mr.] Sargent so he would not testify against her." *Id*. The State subpoenaed Mr. Sargent to testify before a grand jury, and Mr. Sargent moved to quash the subpoena. *Id*. The trial court found the marriage to be valid, and granted the motion to quash. *Id*. at 611. The State then took an

12

interlocutory appeal because of the importance of Mr. Sargent's testimony to the murder investigation and prosecution. *Id.*

On appeal, the court reviewed the scope of Georgia's spousal privilege. *Id.* Specifically, the *Peters* court recognized that the Georgia spousal privilege statute

> essentially incorporated the common-law rule [that] spouses were neither competent nor compellable to testify. An exception was created providing that a wife was competent but not compellable to testify against her husband for a criminal offense upon her person. This exception later was expanded to include a criminal offense committed by either spouse upon the other. . . . Finally, subsection (b) was added in 1987, providing that the privilege shall not apply where the husband or wife is charged with a crime against the person of a minor child.

*Id.* at 611 (internal citations omitted). The court specifically declined to create an additional exception for sham marriages, noting that Georgia's legislature "has not provided an exception for the circumstances of this case." *Id.* at 612. In doing so, the *Peters* court stated that it was following the prevailing rule throughout the country: "Allegations that a marriage was contracted solely for the purpose of barring testimony have been considered by a number of state courts, and they have overwhelmingly declined to create such a judicial exception to the marital privilege." *Id.*

Pennsylvania's intermediate appellate court has also adopted the prevailing rule. In *Commonwealth v. Lewis*, 39 A.3d 341, 343 (Pa. Super. Ct. 2012), *petition for allowance of appeal denied*, 51 A.3d 838, Erin Lewis developed a romantic relationship with Jeffrey Gardner despite the fact that she was employed as his probation supervisor. Mr. Gardner admitted their relationship to a chief county detective, and the Commonwealth charged Ms. Lewis with tampering with public records and obstruction of justice. *Id.* Following the

13

filing of criminal charges, Ms. Lewis married Mr. Gardner. *Id.* Prior to her trial, Ms. Lewis filed a motion to preclude the Commonwealth from calling Mr. Gardner as a witness, and the Commonwealth filed its own motion seeking to compel Mr. Gardner's testimony. *Id.* The trial court granted the Commonwealth's motion to compel, finding that although genuine love existed between them, Ms. Lewis and Mr. Gardner's marriage was "collusive" in that the two married "for the express purpose of preventing Mr. Gardner from testifying against [Ms. Lewis]." *Id.* at 344.

On appeal, the Pennsylvania Superior Court held that the trial court improperly compelled Mr. Gardner to testify. The court began its analysis by noting that the spousal privilege was a creature of statute, and that the statute only provided four exceptions to the privilege, none of which concerned sham marriages. *Id.* at 346. The court then acknowledged "three prevailing approaches" concerning the "reach" of the spousal privilege: 1) that the privilege is not available in a collusive marriage,[10] 2) that the privilege only applies to events that occurred during the marriage,[11] and 3) that the privilege is available "as long as a valid marriage exists[.]"[12] *Id.* at 347.

---

[10] The *Lewis* court cited to *Lutwak v. United States*, 344 U.S. 604 (1953) to support this approach. We shall discuss *Lutwak* in greater detail below.

[11] The *Lewis* court cited to *United States v. Clark*, 712 F.2d 299 (7th Cir. 1983) to support this approach. The *Clark* court, in adopting the "premarriage acts exception," relied on "principles of the common law as they may be interpreted by the courts of the United States [federal courts]," as well as the Federal Rules' "flexibility to develop rules of privilege on a case-by-case basis." *Id.* at 302. Our research has not revealed any state court adopting this exception.

[12] Notably, the *Lewis* court cited *Peters*, *supra*, for this approach.

14

Ultimately, the court chose to adopt the third approach—that the privilege is available provided that a valid marriage exists. To reach this result, the court employed simple statutory construction. Recognizing that the statute did not provide an exception for "collusive" or sham marriages, the court stated, "Because the privilege set forth . . . is a creature of statute, we are bound by its expression and decline to imply exceptions for collusive marriages or pre-marriage events or acts." *Id*. at 350. The court noted that "no one disputes that [Ms. Lewis] and Mr. Gardner were lawfully married when he asserted his . . . spousal testimony privilege. Notably, neither the statute nor the exceptions eliminate or limit the privilege for collusive marriages, or pre-marriage events or actions." *Id*. Because Ms. Lewis and Mr. Gardner's marriage was valid, the court held that the trial court erred in compelling Mr. Gardner's testimony.[13] *Id*. at 351.

Our research confirms that numerous states throughout the country have declined to create a judicial exception to the spousal privilege in the case of a sham marriage. *See* Walsh, *supra*, at 1305; *State v. Chismore*, 274 N.W. 3, 4 (Iowa 1937) (adopting view that Iowa statute precludes spouse's testimony even if defendant marries witness "for the sole purpose of suppressing her testimony"); *Norman v. State*, 155 S.W. 135, 135-37 (Tenn. 1913) (upholding the common law spousal privilege when "it is clear that the marriage, so far as [defendant] was concerned, was entered into for the express purpose of shielding himself against prosecution"); *State v. McGinty*, 126 P.2d 1086, 1090 (Wash. 1942)

---

[13] Although the court held that the trial court improperly compelled Mr. Gardner to testify, it went on to hold that the admission of his testimony constituted harmless error because it was "merely cumulative of other untainted evidence." *Lewis*, 39 A.3d at 352.

15

(recognizing application of the privilege even if defendant married witness "to prevent her from giving testimony which would have been harmful to his defense"); *Cole v. State*, 243 S.W. 1100, 1103 (Tex. Crim. App. 1922) (recognizing that the privilege applies even when the defendant married the witness "for the express purpose of closing her mouth"); *Moore v. State*, 75 S.W. 497, 498 (Tex. Crim. App. 1903) ("When the marriage ceremony is performed, no matter what the motive was or may be, the witness thenceforward becomes the lawful wife of defendant, and is prohibited under [the Texas] statute from testifying against her husband, except where the offense is by the husband against her person."); *United States v. White*, 11 P. 570, 571 (Utah 1886) ("when the marriage ceremony was performed, no matter what the motive was, the witness became beyond all question the lawful wife of the defendant, and in this case she could not testify against his objection"); *State v. Anderson*, 396 P.2d 558, 559-60 (Or. 1964) (noting that timing of marriage did not affect defendant's statutory right to assert the spousal privilege and prevent his wife from testifying against him); *Stevens v. Commonwealth*, 150 S.E.2d 229, 230-31 (Va. 1966) (recognizing that statutory spousal privilege applied where defendant married witness eighteen days before trial); *cf. Commonwealth v. DiPietro*, 367 N.E.2d 811, 823 (Mass. 1977) (recognizing statutory spousal privilege for the sole purpose of preventing testimony, but finding no error in admitting transcript of testimony given by witness prior to marriage).

Although many states recognize the spousal privilege even in the context of a sham marriage, some courts consider the circumstances behind the marriage before deciding whether the privilege may be invoked. In *Osborne v. State*, 623 P.2d 784, 787 (Alaska

1981), "the defendant married his wife, an important witness for the prosecution, just a week before trial." Mr. Osborne argued that "there was no proof that his marriage was a sham, and that absent such proof" his wife was entitled to invoke the spousal privilege not to testify against him. *Id*. The trial court rejected application of the privilege, and the Supreme Court of Alaska affirmed, holding that,

> the circumstances under which the marriage was entered into permit an inference that the purpose of the marriage was to hinder justice, by preventing [the wife's] testimony. Neither the trial court nor we are required to ignore this reality. Moreover, in determining the scope of the marital privilege, i.e., in determining its marginal reach, a court may consider whether sound public policy would be served by applying the privilege in a situation of this kind.
> *Id*.

We note, however, that in rejecting the application of the spousal privilege in *Osborne*, the trial court invoked Alaska Criminal Rule 53, a rule of procedure which provides that "These rules are designed to facilitate business and advance justice. They may be relaxed or dispensed with by the court in any case where it shall be manifest to the court that a strict adherence to them will work injustice." *Id*. In affirming the trial court, the Alaska Supreme Court held that, "the spousal testimonial immunity privilege is capable of being relaxed under Criminal Rule 53." *Id*. Whereas Alaska's procedural rules permitted the court to consider the reasons for the marriage, Maryland has no such rule.

In addition to Alaska, other states have failed to expressly adopt the prevailing rule. *See Glover v. State,* 836 N.E.2d 414, 417-19 (Ind. 2005) (refusing to create an exception to Indiana's statutory marital communications privilege, but recognizing that a sham marriage "may amount to a fraud on the court"); *State v. Taylor*, 642 So.2d 160, 166 (La.

17

1994) (granting trial court discretion to disregard spousal privilege "where the evidence supports a finding that the victim spouse asserting the spousal witness privilege is more probably than not acting under fear, threats or coercion, or that the marriage itself is a sham confected for the purpose of making the privilege available"); *State v. Mauti*, 33 A.3d 1216, 1229 n.11 (N.J. 2012) (although refusing to engraft a judicial exception to statutory spousal privilege, court suggested in a footnote that "[a] sham marriage would present entirely different considerations"); *State v. Gianakos*, 644 N.W.2d 409, 415-18 (Minn. 2002) (acknowledging that, in a proper case, the court may recognize a "sham marriage" exception to Minnesota's statutory spousal privilege, but noting that "[in] no case [has a Minnesota court] ruled that a marriage is not worthy of the protection of the marital privilege, a statutory rule engrained in [Minnesota's] jurisprudence well over a century ago").[14]

The final outlier is *Lutwak v. United States*, 344 U.S. 604 (1953), a United States Supreme Court case holding that spouses were competent to testify where the marriages were fraudulent. There, the petitioners were charged with defrauding the United States "concerning its governmental function and right of administering the immigration laws . . . by obtaining the illegal entry into this country of three aliens as spouses of honorably discharged veterans." *Id*. at 605 (internal quotation mark omitted). At the time, "Alien spouses of honorably discharged veterans of World War II were permitted to enter this

---

[14] We also note that South Dakota, which repealed its statutory spousal privilege in 1979, currently only recognizes the confidential communications privilege. *State v. Witchey*, 388 N.W.2d 893, 894 n.2 (S.D. 1986).

country under the provisions of the so-called War Brides Act." *Id*. at 606. The petitioners organized marriage ceremonies with the intent that "[t]he parties to the marriages were not to live together as husband and wife, and thereafter would take whatever legal steps were necessary to sever the legal ties." *Id*. at 607.

Following the petitioners' convictions, the Supreme Court considered "whether these so-called wives [were] competent to testify against their purported husbands in this criminal prosecution and thus incriminate the so-called husbands." *Id*. at 613. The Supreme Court concluded that the spouses were competent to testify, stating,

> When the good faith of the marital relation is pertinent and it is made to appear to the trial court, as it was here, that the relationship was entered into with no intention of the parties to live together as husband and wife but only for the purpose of using the marriage ceremony in a scheme to defraud, the ostensible spouses are competent to testify against each other. Here again, we are not concerned with the validity or invalidity of these so-called marriages. We are concerned only with the application of a common-law principle of evidence to the circumstances of this case.

*Id*. at 614. Although this language appears to permit a trial court to look behind the marriage to determine whether a spouse is competent to testify, *Lutwak*'s context makes its holding distinguishable.

Importantly in *Lutwak*, the Supreme Court stated that, "The common understanding of a marriage, which Congress must have had in mind when it made provision for 'alien spouses' in the War Brides Act, is that the two parties have undertaken to establish a life together and assume certain duties and obligations." *Id*. at 611. Unlike the various states which simply require a valid marriage to invoke the spousal privilege, the *Lutwak* Court defined marriage as the specific intent to "establish a life together and assume certain duties

19

and obligations." *Id.* This narrow definition of "marriage" made sense in that post-war circumstance:

> Congress intended to make it possible for veterans who had married aliens to have their families join them in this country without the long delay involved in qualifying under the proper immigration quota. Congress did not intend to provide aliens with an easy means of circumventing the quota system by fake marriages in which neither of the parties ever intended to enter into the marital relationship[.]

*Id.* This proposed definition of marriage, for purposes of the War Brides Act and federal immigration policies, is unique to *Lutwak*. As noted in *Hagez*, however, in Maryland, "one who marries for money, or to enhance one's career, or for estate purposes, seemingly would be entitled to invoke the privilege, so long as the marriage is valid[.]" 110 Md. App. at 211 n.7. Accordingly, we are not persuaded that *Lutwak*'s interpretation of "marriage" as described in a federal statute applies to the circumstances present in the instant case.[15]

Having surveyed the cases concerning the spousal privilege in the context of a sham marriage, we cannot discern any prevailing minority position. Alaska's specific procedural rules allow it to disregard the spousal privilege in the interests of justice. *Osborne*, 623 P.2d at 787. Louisiana allows a trial court to determine whether the witness is acting under fear, threats, or coercion, or that the marriage is a sham, before allowing a spouse to invoke

---

[15] We note that both the Ninth and Tenth Circuit Courts of Appeal have followed *Lutwak*'s holding and declined to recognize the privilege when the marriage was not entered into in good faith. *See United States v. Saniti*, 604 F.2d 603, 604 (9th Cir. 1979); *United States v. Apodaca*, 522 F.2d 568, 571 (10th Cir. 1975). Additionally, in *United States v. Blair*, 54 F.3d 639, 645 (10th Cir. 1995), the Tenth Circuit upheld a district court's sentence enhancement for obstructive conduct where the defendant married a witness who did not wish to testify against him in grand jury proceedings.

the privilege. *Taylor*, 642 So.2d at 166. Indiana has refused to create a judicial exception, yet it has not foreclosed the possibility that a sham marriage "may amount to a fraud on the court." *Glover*, 836 N.E.2d at 419. New Jersey has also declined to create a judicial exception, but has cryptically noted that "[a] sham marriage would present entirely different considerations." *Mauti*, 33 A.3d at 1229 n.11. Minnesota suggests that in an appropriate case, a court could recognize a sham marriage exception, but its Supreme Court nevertheless noted that no Minnesota court has ever done so. *Gianakos*, 644 N.W.2d at 417-18. South Dakota legislatively repealed the spousal privilege, taking the issue away from the courts altogether. *State v. Witchey*, 388 N.W.2d 893, 894 n.2 (S.D. 1986). Finally, in *Lutwak* the Supreme Court construed "marriage" as it pertained to the War Brides Act, *i.e.*, "that the two parties have undertaken to establish a life together and assume certain duties and obligations." 344 U.S. at 611.

We find none of these approaches persuasive. Instead, we expressly adopt the prevailing rule, and hold that in Maryland, if the parties are validly married, a spouse may invoke the spousal privilege codified at CJP § 9-106, subject to the exceptions expressly provided in § 9-106(a)(1) and (2).

### *Marrying for the Purpose of Invoking the Spousal Privilege is not "Corrupt Means"*

Having adopted the prevailing rule that permits a witness to invoke the spousal privilege in the context of a sham marriage, we now turn to appellant's convictions. In this case, the State's theory of prosecution was that appellant's alleged marriage to Ms. Bannister constituted "corrupt means" as that term appears in both the witness tampering

21

and obstruction of justice criminal statutes.

Md. Code (2002, 2012 Repl. Vol., 2018 Supp.), § 9-305 of the Criminal Law Article ("CL"), which prohibits witness tampering, provides, in relevant part:

(a) *Prohibited.* – A person may not, by threat, force, or **corrupt means**, try to influence, intimidate, or impede a juror, a witness, or an officer of a court of the State or of the United States in the performance of the person's official duties.

(b) *Solicitation prohibited.* – A person may not solicit another person to, by threat, force, or **corrupt means**, try to influence, intimidate, or impede a juror, a witness, or an officer of the court of the State or of the United States in the performance of the person's official duties.

(Emphasis added). Section 9-306(a) of that Article, which prohibits obstruction of justice, provides:

(a) *Prohibited.* – A person may not, by threat, force, or **corrupt means**, obstruct, impede, or try to obstruct or impede the administration of justice in a court of the State.

(Emphasis added).

Both statutes prohibit action by "threat, force, or corrupt means" intended to either tamper with a witness or obstruct justice. During argument on appellant's motion for judgment of acquittal, the State acknowledged that its only theory of appellant's criminal culpability stemmed from the statute's "corrupt means" language. When the trial court asked the State for its theory of "corrupt means" culpability, the State responded, "The corrupt means is engaging in a fraudulent marriage for the sole purpose of shutting up a witness, to put it bluntly."

As we have shown, in many states "engaging in a fraudulent marriage for the sole purpose of shutting up a witness" is a statutorily sanctioned means to prevent a witness

22

from testifying.[16]   Those states simply require a valid marriage in order to invoke the privilege—it is irrelevant for purposes of the privilege whether the marriage serves a fraudulent purpose.  In light of our adoption of the "prevailing rule," we fail to see how the act of marrying for the express purpose of invoking the privilege can constitute "corrupt means" witness tampering or obstruction of justice.  In short, a person cannot be guilty of "corrupt means" witness tampering or obstruction of justice where the allegedly criminal act—marrying with the express purpose of invoking the spousal privilege—is recognized as a lawful and permissible means for the new spouse to avoid being compelled to testify.

We recognize that this rule creates an obvious potential for mischief.  Nevertheless, there is currently no "sham marriage" exception to the spousal privilege set forth in CJP § 9-106, and we decline to create a judicial exception.  Any amendment to CJP § 9-106 must come from the General Assembly. [17]

> **JUDGMENTS OF THE CIRCUIT COURT FOR CHARLES COUNTY REVERSED. COSTS TO BE PAID BY CHARLES COUNTY.**

---

[16] Additionally, at least one state, Tennessee, reaches the same conclusion based on the common law.  *Norman*, 155 S.W. at 135-37.

[17] Nothing in our opinion should be construed as deciding whether appellant's phone-marriage to Ms. Bannister constituted a legally valid marriage as defined in Md. Code (1984, 2012 Repl. Vol., 2018 Supp.), §§ 2-201 to -407, -409, -410 of the Family Law Article.  We simply hold that, regardless of his intent, appellant's efforts to marry Ms. Bannister do not constitute "corrupt means" as a matter of law.